[Civ. Nos. 27538, 27814, 28202, 30550.
Second Dist., Div. Two. July 12, 1968.]

WAYNE HILLMAN, Plaintiff and Respondent, v. WALTER
G. STULTS, Individually and as Administrator, etc.,
Defendant and Appellant.

(Consolidated Appeals.)

Morris Lavine for Defendant and Appellant.

Muller & Woolpert and Wickson R. Woolpert for Plaintiff and Respondent.

NUTTER, J. pro tem.*—This case involves consolidated appeals from certain orders involving a conservatorship and a receivership and a judgment holding that extensive ranch holdings, real and personal property of respondent Hillman in San Luis Obispo County were held in trust for him by his sister, Genie Hillman Stults. The dispute resulted from an effort by Hillman who had been convicted of murdering his wife[1] to retain and preserve his property holdings during his imprisonment by conveying and transferring his property to his sister as trustee. The sister is now deceased. Her estate has

---

*Assigned by the Chairman of the Judicial Council.

[1]Hillman was found guilty of first degree murder. On appeal it was reduced to second degree murder. (*People* v. *Hillman,* 140 Cal.App.2d 902 [295 P.2d 939].) Respondent received a certificate of release and discharge on February 14, 1966.

been substituted through her husband Walter Stults who is now a party as administrator and an individual appellant. After many years of complex litigation, the trial court, in giving judgment to respondent held that Hillman was the owner of the real and personal property; he had transferred his property to his sister in trust, other than a Cadillac which he gave to her in recognition of her services to him. The trust was terminated. The court ordered the sister to return to Hillman jewelry with an alternative that if it was not returned by June 1, 1965, he should recover the value of the items which was fixed at $10,000; the court also approved certain ranch leases and ordered appellant's sister to pay to respondent the sum of $30,570.55 on an accounting but denied appellants any trust administration fees; the court imposed an order for sanctions against appellant's estate in the sum of $40,000 for the expenses of plaintiff in proving title and $20,000 for the expense of proving the accounting.

The consolidated appeals require a determination of the right of a prisoner to be involved in the creation of a trust as a beneficiary; the jurisdiction of the Adult Authority to partially restore the civil rights of an inmate and parolee so that he may conserve and protect his property; the rights of the court to establish a conservatorship in his home county for the property of a prisoner confined in a county other than his home residence; the validity of a subsequent receivership and the settlement of the receiver's account; orders of reference and accounting; the validity of lease transactions involving the ranch and finally sanctions of $60,000 imposed against the sister's estate for expenses imposed in proving the title and accounting. We are of the opinion that the orders and judgment should be affirmed except for the amount of sanctions.

The following is a brief summary of the most pertinent events:

In January 1955, respondent, the owner of a 6,480-acre ranch in San Luis Obispo County, murdered his wife. In April of the same year during the murder trial, respondent appointed his sister, Genie Stults, guardian of his children and she took possession of the bulk of plaintiff's separate real and personal property. On April 22, 1955, respondent gave her a general power of attorney before his sentence following his murder conviction. However, it was agreed by respondent and his sister that the power of attorney was inappropriate because of administration problems and difficulties in obtaining credit for the extensive operations of the ranch. To avoid

these problems on June 9, 1955, it was decided by respondent and his sister to set up a simple trust. Cornish, the sister's attorney, drafted a trust letter from the sister to respondent, describing the nature of the prospective transaction and relationship between them.

In a letter to the Adult Authority on June 8, 1955, enclosing the deed, and bill of sale, Cornish stated: "Also enclosed is a letter in which it is proposed Mrs. Stults will sign and deliver to Wayne Hillman so as to prove his beneficial interest in the property." The letter, dated June 9, 1955, stated:

"On the face of these documents [deed and bills of sale] they purport to convey absolute ownership to me, and it is thoroughly understood that the reason you are transferring this property to me in that manner is to enable me to more effectively deal with it for the purpose of administering the property, collecting the income, borrowing on it, or take other necessary steps to preserve it while you are confined in the state penitentiary, and although on the face of the record I appear to have a complete title, I hold it strictly in trust for you and acquire no beneficial interest save and excepting to the extent it may be necessary to protect me to the extent that I may hereafter find it advisable to pledge my personal credit on your behalf.

"I am furnishing you with this letter so that at any time you desire the property back to administer it yourself, or in the event of my death, you will have this to show that you are the real owner of the property and that neither I nor my estate has any beneficial interest in the property save and excepting to the extent that my personal credit may have been pledged in your behalf."

In his petition for partial restoration of his civil rights so that he could deed and transfer the property, Hillman stated that the purpose of the request was "So that my sister can have a free hand to handle my business affairs, and I fully believe that she will act in my best interest." The application was approved by the assistant warden, and respondent executed deeds and bills of sale to the sister, for the real and personal property.

Respondent's sister gave respondent an executed copy of the letter and respondent retained a copy. The trial court held that this letter was an integrated part of the trust transaction and there was a full disclosure of the intended transaction to prison officials.

It found that: "It was the intention of both the plaintiff

and the said defendant, when said documents were exchanged, that the transfer was not a conveyance for consideration but instead was strictly in trust pursuant to the express, written trust agreement dated June 9, 1955. It was further the intention of the parties thereto that the trust was to be a gratuitous, sisterly effort on the part of Genie H. Stults, compensation not being intended, but reimbursement and security being provided said defendant pursuant to said June 9, 1955 letter.''

In 1956, the law firm of Muller and Woolpert was retained by respondent's sister to represent respondent in a civil suit brought against him by his stepson for the wrongful death of his mother. Muller and Woolpert insisted that respondent's sister assume the obligation of respondent's fee.

Respondent and his sister had several disputes concerning the administration of the ranch properties. In 1959, Muller and Woolpert sought unsuccessfully to obtain a voluntary accounting from appellants of their administration of respondent's ranch interests. Finally, on September 24, 1959, plaintiff applied to the Adult Authority for permission to petition for appointment of Muller and Woolpert as conservators of plaintiff's property in San Luis Obispo County. Mr. Cornish, the sister's attorney who prepared the trust letter of June 9, 1955, opposed the petition as unnecessary. The Adult Authority granted permission as requested and on January 18, 1960, the San Luis Obispo Superior Court appointed Muller and Woolpert as conservators of the property.

On April 6, 1960, the sister's husband, Walter Stults, sued his wife as trustee for the expenses of the administration of the trust for respondent's property.

On May 12, 1960, Muller and Woolpert as conservators, filed an action to establish title to the real and personal property, to declare a trust, compel a conveyance and accounting of the property deeded and conveyed to the sister in June 1955.

On June 14, 1960, Muller and Woolpert as conservators obtained a receiver for the ranch property because of conflicts between respondent and appellants concerning rental payments and problems concerning the disposal of the crops. On April 5, 1961, respondent filed a request for admissions of the genuineness of the June 9, 1955 trust letter. Appellants denied the validity of the letter or its delivery to respondent; they also denied certain judicial and extra-judicial admissions concerning the status of the trust by appellant's sister or her prior attorneys.

On February 23, 1962, plaintiff was released on parole. He appeared and testified at the trial. On June 7, 1962, the trial court made an interlocutory judgment holding that the real and personal property were held in trust by the sister but there was no agreement for trustees' fees. The court ordered an accounting and reference. On September 13, 1963, respondent received a further partial restoration of civil rights from the Adult Authority and was given permission to substitute as personal party plaintiff in place of Muller and Woolpert. The court approved the substitutions on October 22, 1963. Testimony on the accounting reference was closed on December 16, 1964.

In its final judgment on May 3, 1965, the court decreed the trust terminated and found defendant had breached her trust to the plaintiff so that it was inequitable for her to receive fees for herself or her attorney.

Basically, appellants argue that no trust was ever created; it violated the statute of frauds; the trust letter was never delivered by the sister to respondent; respondent was civilly dead and lacked the capacity to create any trust because of his conviction and sentence to life imprisonment; that if the parties attempted to create a trust it was void and all subsequent and ancillary proceedings in support thereto were nugatory and illegal; that Hillman not only lacked the capacity to create a trust or be the beneficiary of a trust, he could not be the principal for a conservatorship; a conservatorship could not be filed in his behalf or in San Luis Obispo County; he could not be substituted as a party plaintiff while on parole; the Adult Authority lacked jurisdiction to restore his civil rights to any degree; that if the court was correct in impressing a trust, appellants should have been compensated for their services.

In addition to these arguments, appellants alleged they did not receive a fair trial; they were improperly denied a jury trial.

Other assignments of error include allegations that the State of California is an indispensable party; that appellants should have been given notice of the Adult Authority hearings; the court should have disqualified Muller and Woolpert as attorneys and conservators because they were guilty of champerty and of violation of a conflict of interest and a confidential relationship to the sister; the court and referee committed errors in admitting and excluding evidence; the order of reference and the appointment of an accountant were

improper; the receivership orders were improper; the findings of fact and conclusions of law were not supported by the evidence or were insufficient or inadequate; the court failed to consider appellants' counterclaim. Counsel for appellants has clothed many of these issues in constitutional garb and reiterated and repeated them in briefs in excess of 800 pages. The main thrust of their argument is a contention that it is unfair and inequitable for a felon to use the processes of the Adult Authority and the courts, to retain or preserve his property while confined in prison or on parole.

### THE LEGAL CAPACITY OF RESPONDENT

Appellants allege that even if respondent and his sister intended to create a trust, these efforts were illegal and void because Hillman had no capacity to create a trust and the orders of the Adult Authority and the orders and judgment of the San Luis Obispo Superior Court were void and in excess of their jurisdiction; that Penal Code section 2601 permitting a partial restoration of civil rights for inmates is unconstitutional and an invasion of the Governor's power of pardon.

Section 2601 of the Penal Code provides: "A person sentenced to imprisonment in the state prison for life is thereafter deemed civilly dead. But the Adult Authority *may restore to such person during his imprisonment such civil rights as the authority may deem proper*, except the right to act as a trustee, or hold public office, or exercise the privilege of an elector, or give a general power of attorney. *This section shall not be construed so as to deprive such person of his right to inherit real and personal property in accordance with the laws of this State."* (Italics supplied.)

The California Attorney General has stated: "The concept of civil death has been severely criticized and the pattern of decisions reveals that the courts are increasingly reluctant to strip a prisoner of his civil rights on the basis of this medieval doctrine. (See comments, 26 So.Cal.L.Rev. 425, and 50 Harv. L.Rev. 968, and cases therein cited.) It is evident that the courts have construed the statutory exceptions to civil death or the suspension of civil rights with liberality and it is likely that they will continue to do so. [Citations omitted.]" (27 Ops.Cal.Atty.Gen., p. 243.)

Plaintiff's applications for a limited restoration of civil rights came within the framework of the constitutional and statutory plan permitting limited civil rights for inmates

and parolees. ■ The grant of pardoning power to the Governor is different from the legislative grant to the Adult Authority to restore civil rights during imprisonment and parole. Restoration of civil rights does not relate to the power to reprieve, pardon or commute sentences. Pardon power is an additional, not an exclusive procedure. (Pen. Code, § 4852.19.)

Adoption of appellants' arguments would make sections 2600 and 2601 of the Penal Code meaningless. A holding that a felon must wait for a certificate of rehabilitation and pardon before regaining any civil rights, would invalidate earlier precedents upholding the limited restoration of civil rights during imprisonment or parole. It would negate practical and necessary transactions for inmates' property. ■ It is well settled that real or personal property owned by a prisoner may be sold or conveyed by him. (Pen. Code, § 2603; 27 Ops. Cal.Atty.Gen., p. 241; *Davis* v. *Superior Court,* 175 Cal.App. 2d 8 [345 P.2d 513].) Conveyance includes transfers in trust. It is reasonable to conclude that legal title could be conveyed with equitable title remaining. (*Seal of Gold Mining Co.* v. *Slater,* 161 Cal. 621, 631 [120 P. 15].) ■ When the Legislature prohibited a prisoner from becoming a trustee it did not deny the right to become a beneficiary under a trust. There is no reason to imply from the wording of the statute a limitation of the power of the Adult Authority to permit a transfer in trust, reserving the beneficial interest. As stated in Restatement Trusts, section 19, ''A person has capacity to create a trust by transferring property *inter vivos* in trust to the extent that he has capacity to transfer the property *inter vivos* free of trust.''

In *Hall* v. *Hall,* 98 Cal.App.2d 209 [219 P.2d 808], after a property transaction had been accomplished, the Adult Authority was held to have ratified a parolee's position as beneficiary of a trust he had created. In *Jordan* v. *Warnke,* 205 Cal.App.2d 621 [23 Cal.Rptr. 300], the court upheld a resulting trust on behalf of a parolee without intervention of the Adult Authority. ■ These cases where the state was not a party, and the pertinent sections of the Penal Code make it clear that there is no valid distinction regarding transfer of property between the status of an inmate under either a life or less-than-life sentence, or whether in prison or on parole. ■ These cases also make it clear that defendant's argument that the State of California is an indispensable or necessary party to this litigation is without merit.

Appellants have ignored the distinction clearly established in the cases between the Adult Authority's control over the person of a prisoner or parolee and his property outside of prison. Finally, the state through the Adult Authority, was on notice of Hillman's effort to protect his property since the Adult Authority gave permission for him to institute the conservatorship.

■ The trial court's grant of authority to respondent to file his supplementary complaint as real party in interest in place of the conservator was proper.

It is unnecessary that Muller and Woolpert be resubstituted as conservators and party plaintiffs to the full extent proposed in the ''Consent and Stipulation That Parties' Plaintiff Be Changed,'' lodged with this court at the time of oral argument herein.

The consent and stipulation is approved solely because the conservatorship has not been terminated and to that extent Muller and Woolpert are bound as conservators and parties in place of Hillman individually. (*McClure* v. *Donovan,* 33 Cal. 2d 717 at p. 739 [205 P.2d 17].)

## RIGHT OF APPELLANTS TO BE PARTIES
### TO ADULT AUTHORITY HEARINGS

■ There is no right of strangers or relatives to be a party to Adult Authority proceedings. Notice is not required by either statute or any case law. Establishment of a requirement for notice would be a serious administrative inconvenience to the work of the authority. Obviously, compliance with appellants' request for notice would have resulted in objections by the appellants to the restoration of any of respondent's civil rights; the appellants' desire for notice had nothing to do with respondent's possible rehabilitation while in custody.

■ The Adult Authority did not exceed its jurisdiction when it partially restored respondent's civil rights: (1) To execute the deed and bill of sale to implement the trust (June 14, 1955) ; (2) To sign a petition for conservatorship (September 24, 1959) ; (3) Gave permission to plaintiff to substitute as party plaintiff (September 13, 1963).

### A TRUST WAS PROPERLY CREATED

■ We have quoted portions of respondent's petition to the Adult Authority and the letter to the authority explaining the transaction involving the transfer of respondent's property. Respondent did not conceal the nature of the proposed trust transaction from prison authorities. The assistant

warden made suggestions to Cornish about means of solving respondent's problems concerning the management and control of his ranch. While these letters and documents of the parties and respondent's attorney in June 1955 are sufficient to support the trial judge's determination that a trust was created, there was other clear and convincing evidence in the record, both documentary and oral, to sustain the court's finding. Some of this evidence was in the form of judicial admissions.

Thus, in a petition for a writ of prohibition filed before this court on December 21, 1959, the appellant sister alleged ". . . In 1955, while Wayne Hillman was confined at the State Prison at Chino pursuant to sentence as aforesaid, and with the knowledge and approval of Adult Authority, and with his civil rights restored for that purpose, Wayne Hillman transferred to petitioner real and personal property under an agreement, and for the purpose, that petitioner would advance her personal funds where necessary to preserve said property from loss to creditors of Wayne Hillman, would hold title to said real property until the release of said Wayne Hillman from custody and the restoration of his civil rights, and would then return said property and petitioner would account to Wayne Hillman . . ."

In an affidavit dated July 9, 1960, in opposition to the appointment of a receiver, the sister stated that she had "a legal right and duty to hold the title to said property and to manage and operate the same so long as plaintiff is confined in a state penitentiary"; she also alleged that a formal accounting was being made of the property.

In a complaint by appellant Walter Stults, filed in April 1960, against his wife "as trustee for Wayne Hillman," appellant Stults alleged that respondent engaged appellant to act as a trustee while confined in the state penitentiary and "for the purpose of empowering the said defendant to act as trustee did on July 15, 1955 transfer to said defendant as trustee."

The trial court found the trust was founded on an express written agreement (the letter of June 9) but if "for any reason the trust could not be recognized as an express trust" it could be considered a resulting trust for equitable reasons. The complaint has sufficient allegations to support the judgment that the sister held the property in trust whether it was termed a resulting or constructive trust. (*Fish* v. *Security-First Nat Bank*, 31 Cal.2d 378 [189 P.2d 10].)

It is apparent that the real issue before the trial court at the title stage of the trial was simply whether a trust was created, not whether it was an express, resulting or constructive trust. The pretrial order permitted the court to find an express, resulting or constructive trust. The order provided "This suit is one to . . . (b) Impress a trust on said property, . . . (d) Compel a conveyance and transfer of said real and personal property respectively from Defendants, Stults, to Plaintiff, Hillman, . . .

"The issue to be decided, by stipulation, between Plaintiff, Hillman, and Defendants, Stults, at a trial on this point alone is as follows:

"Did Plaintiff, Wayne Hillman, convey and transfer the real and personal property involved in this case, outright to Defendant, Genie H. Stults, by Deed and Bill of Sale on or about June 15, 1955, or did he convey and transfer the same to her in trust to be held by her subject to such trust? Defendants, Stults, contend the former; Plaintiff the latter."

While the bulk of appellants' arguments are directed to the alleged inequity in permitting a "lifer" to hold property, bring suit or be a beneficiary of a trust, contrary to appellants' contentions, the equities of this situation were in plaintiff's favor. A resulting trust would avoid the effects of any possible innocent illegal transactions, and would effectuate the original intentions of the parties. Certainly a trust is consonant with the original intention of the parties. Aside from the express written evidence, the intent of the brother and sister can be inferred from the circumstances of respondent's predicament. It is apparent that at least for the years 1955 through 1959, the respondent and his sister did not intend that the beneficial interest in this property would be denied him. This. was a classic simple trust expressed in a letter specifying that the property was vested in the sister for the benefit of the brother while he was in prison. The terms of the administration of the trust were necessarily left to construction of law.

There is no merit in appellants' argument that because the trust letter was separate from the deed and bill of sale, no trust was created and the statute of frauds was violated. The trial judge found that the transaction between respondent and his sister in June 1955 was "a package deal." A trust may be expressed in a separate agreement. (*Coyle* v. *Coyle,* 212 Cal. 715 [300 P. 5] [conveyance of land from father to son, written promise by son to reconvey];

*Roberts* v. *Taylor* (9th Cir. 1924) 300 F. 257 [absolute conveyance of realty with written agreement by grantee to manage land and pay profits therefrom to third person].). To satisfy the statute of frauds the memorandum may be signed by the transferee prior to or at the time of the transfer, or subsequently. (Rest., Trusts, § 42.)

It is unnecessary for us to summarize the evidence supporting the trial judge's finding that the sister delivered the trust letter to respondent. There was substantial evidence to support this finding.

: The appellants' argument that the sister obtained title to the ranch by adverse possession is entirely without merit. There was no claim of adverse ownership until 1959. At least until that date, all parties acted as if respondent was the beneficiary of a trust.

· The inclusion of respondent's personal property in the judgment was proper. The complaint listed items of personal property which were specified in the bill of sale. Then it was alleged that in addition to the described personal property, plaintiff had owned other items of personal property, the precise nature and description of which he was then unable to provide. Respondent reserved the right to amend the complaint to specify the other items once the information was acquired. In substance the procedure amounted to an amendment of the issues as framed by the pleadings and pretrial order. (*Feykert* v. *Hardy,* 213 Cal. App.2d 67 [28 Cal.Rptr. 510].) In a suit for accounting, the pleader is not required to state specifically facts peculiarly within the knowledge of the opposite party. (*Morehead* v. *Turner,* 41 Cal.App.2d 414 at p. 419 [106 P.2d 969].)

 The trial court proceeded on the basis that the unidentified personal property items could be described by plaintiff in part during the title portion of the trial and in part during the trust accounting. Eventually every item was described in writing during the trial pursuant to the court's direction. Appellants made a written response to the description. The procedure was the equivalent of an amendment to the complaint and answer. This was a realistic approach under the circumstances. Appellants were given full notice of respondent's claim and a fair opportunity to meet it. The formal list and answer were a matter of record. The evidence was produced and contested. No prejudice resulted to appellants.

### The Denial of Compensation to Appellants for Duties Performed Under the Trust Was Proper

The court found there was no express agreement for the sister to receive compensation as trustee. In a letter to petitioner, dated July 9, 1955, the sister stated that the trust "Is not a paying job to us and we are doing it because we have your interest at heart and we believe that you, of all the family, would do the same for us." If a trustee's services are intended to be gratuitous, the trustee is not entitled to compensation. (*Weygant* v. *Bartlett,* 102 Cal. 224 [36 P. 417]; 49 Cal.Jur.2d, p. 124.) After changing attorneys and repudiating their earlier admissions of the trust, appellants gambled that they could obtain a court ruling that they held the ranch property with no obligations to plaintiff. Then, after the trial court's interlocutory ruling that there was a trust, appellants requested trustee fees. The trial judge held that appellants administered the trust property contrary to plaintiff's rights; their attempt to claim adverse possession was a breach of trust; it would be inequitable for them to receive any fees after taking advantage of plaintiff's incarceration and attempting to obtain his property when he was in a helpless condition; by this conduct they repudiated the right to compensation for fees. This ruling was not an abuse of discretion and is amply supported by the evidence and the law.

Compensation is allowed for a trustee if they have performed their duties faithfully. If he repudiates the trust, or violates or neglects his duty he is not entitled to compensation or commissions. (*Marshall* v. *Marshall,* 232 Cal.App.2d 232 at p. 258 [42 Cal.Rptr. 686]; *Jordan* v. *Warnke,* 205 Cal.App.2d 621, 635 [23 Cal.Rptr. 300]; 49 Cal.Jur.2d, p. 133; *Estate of McLellan,* 8 Cal.2d 49, 55 [63 P.2d 1120].)

### The Denial of the Counterclaim Was Proper

Appellants' argument that the trial judge failed to consider their counterclaim for trustee's fees is without merit. The trial judge's denial of appellants' request for compensation and reimbursement was in most specific terms. The argument that respondent defaulted to appellants' supplemental answer re accounting and counterclaim is without merit. A counterclaim is deemed controverted without further pleading by the adverse party. A counterclaim is a matter of defense raised by an answer. (Code Civ. Proc., § 462; 2 Witkin, Cal. Procedure (1954) p. 1590; *Pickwick Stages* v. *Board of Trustees,* 189 Cal. 417 [208 P. 961]; *San Joaquin Brick Co.* v.

*Mulcahy*, 58 Cal.App. 295 [208 P. 351]; *Taliaferro* v. *Taliaferro*, 154 Cal.App.2d 495 [316 P.2d 393].)

### SPECIAL DEFENSES AND UNCLEAN HANDS

 The court did not commit error in denying appellants' request to amend their pleadings by adding as special defenses, estoppel, laches and the statute of limitations. It is apparent that neither the statute of limitations nor laches apply to this case. The circumstances of any possible estoppel were fully litigated. "Unclean hands" was not an issue in pretrial order and not pleaded. It is apparent from the trial judge's determination that he did not consider Hillman to be a party to inequitable conduct in the creation and purpose of the trust. Except for the alleged inequity of a convicted murderer being the beneficiary of a trust, which is the main thrust of this appeal, appellants' arguments concerning Hillman's alleged unclean hands involved peripheral and immaterial matters such as certain letters written by Hillman and minor matters which took place while he was incarcerated. "Whenever an inequitable result would be accomplished by application of the 'unclean hands' doctrine the courts have not hesitated to reject it." (*Womack* v. *Womack*, 242 Cal.App.2d 572 at p. 579 [51 Cal.Rptr. 668].) It was not necessary for the court to refer to the clean hands or lack of clean hands in view of the other express and implied findings concerning the purpose of the trust and the circumstances surrounding its creation. (*Marshall* v. *Marshall*, 232 Cal.App.2d 232, at p. 252 [42 Cal.Rptr. 686].) The express reference to the purpose of the trust obviously excludes a fraudulent purpose.

 The trial court did not commit error in restricting Hillman's cross-examination concerning the unclean hands issue or with reference to the alleged transfer of the ranch as a fraud on his creditors. While it is true that the trial judge did restrict cross-examination concerning the suit by Hillman's stepson for the wrongful death of his mother, the restriction was not imposed until there was full and adequate evidence on the subject of the suit and its subsequent disposition. Once the matter was before the court, the trial judge was entirely proper in restricting repetitious cross-examination. It was a reasonable exercise of discretion in the administration of the trial. (*Marshall* v. *Marshall, supra*, at p. 255.)

### CONSERVATORSHIP—VENUE

 The petition for conservatorship was filed in San

Luis Obispo, the location of respondent's ranch and property. Appellants have argued that the court had no jurisdiction to grant a conservatorship in San Luis Obispo County because respondent was a prison inmate and was not a resident of San Luis Obispo.

We are aware of no cases which interpret conservatorship provisions for prisoners or parolees. Section 2051 of the Probate Code provides: ''Conservatorship proceedings for a resident of this State shall be instituted in the superior court in the county of the residence of the proposed conservatee. Such proceedings for a nonresident of this State shall be instituted in the superior court in the county in which·he is temporarily living if he is in this State, or in the superior court in any county in this State in which he has property. After commencement, a conservatorship proceeding may be transferred to another county within this State or to the jurisdiction of the courts of another state as provided in this chapter.'' These provisions permitting proceedings for nonresidents in counties where the property is located and providing for transfer to other counties, make it apparent that the Legislature intended that the courts should have some flexibility in venue.

In this instance, respondent, a longtime resident of San Luis Obispo County, was involuntarily removed to various prisons outside of his home county. ██ Prisoners do not gain or lose residence as a result of being removed to the prison system. (Const., art. II, § 4; Elec. Code, § 14283.)

The meaning of residence in these sections is synonymous with domicile. (*Smith* v. *Smith,* 45 Cal.2d 235, 239 [288 P.2d 497].) Domicile has always been distinguished from a residence which is a place of being from time to time. Jurisdiction may be and was conferred by the voluntary petition. (*In re McDonald,* 45 Cal.App. 480 [187 P. 991] ; 13 Cal.Jur.2d, p. 590.)

██ Finally, the location of the property, the situs of the leases and the permanent home of respondent in San Luis Obispo County make that county the practical venue for this conservatorship.

### CONSERVATORSHIP FOR PRISONERS
### AND PAROLEES

██ A conservatorship, unlike a general power of attorney, is subject to supervision by the court. It operates as an arm of the law through the court and the conservator is subject to the control of the court in the discharge of his duties.

██ An inmate or parolee is not required to abandon his property while confined or on parole. Section 2604 of the Penal Code provides that no conviction results in a forfeiture of property except when expressly imposed by law. While the Adult Authority has control over the person of the inmate, his outside property does not come within its supervision or control. The Adult Authority has neither the facilities nor the personnel to administer the outside property of an inmate. Conservatorship is a reasonable means for the conservation of the property of inmates or parolees when no other means are available.

Appellants are probably correct in stating that conservatorship is either very rare or unknown among inmates. It may be that prisoners have not utilized conservatorship procedure for a very practical reason. It would be unusual for any person with the financial resources and property of respondent to be confined in state prison. Most felons have little or no property.

██ Imprisonment or parole with a consequent limitation of civil rights is a cause or disability within the meaning of the conservatorship law of 1957.

Section 1751 of the Probate Code is very broad and respondent's situation is especially appropriate to a conservatorship of the property over which no legal entity or court supervised representative would otherwise be responsible.

Section 1751 provides: "Upon petition . . . the superior court, if satisfied by sufficient evidence of the *need* therefor, shall appoint a conservator of the . . . property . . . of any adult person who by reason of . . . [naming certain physical and mental disabilities] . . . *or other disability, or other cause* is unable properly to care for . . . his property, or who for said causes or for any other cause is likely to be deceived or imposed upon by artful or designing persons . . . or who voluntarily requests the same and to the satisfaction of the court establishes good cause therefor." (Italics added.)

Hillman was competent when he petitioned for the appointment of the conservators, his civil rights having been restored for that purpose. Irrespective of his civil competence, his mental competence was not questioned. Section 1752 refers to the "capacity to form an intelligent preference." He had that capacity. His disability was a physical restriction which prevented him from managing his property and making contracts involved in property management.

If the "or other disability," which follows the specified physical and mental disabilities, means physical or mental

disabilities, then the next clause *"or other cause is unable properly to care for his property"* means something other than "disability," which would include respondent's incarceration. Next are the words: ". . . or who for said causes or for any other cause is likely to be deceived or imposed upon by artful or designing persons . . ." This is the subject matter of this litigation. Finally, the last clause is: ". . . or who voluntarily requests the same and to the satisfaction of the court establishes good cause therefor." Respondent voluntarily requested the appointment and satisfied the court of good cause. In view of the appellants' position that they obtained title by adverse possession or by an absolute transfer, and then refused to give an accounting, respondent's need was especially clear.

While the statute does not enumerate all the special classes coming within its purview, it is apparent that the Legislature intended to grant a new protective relationship where none previously had been available. The statute provides benefits in cases where guardianships are not permissible. The conservatees include persons who cannot manage their affairs properly or who themselves petition for the appointment of a conservator. (32 State Bar J., at p. 585.) The statute may protect individuals who are handicapped by disabilities other than mental. "The mere fact that a conservator is appointed is not a determination that the conservatee is in any wise 'insane or incompetent.'" (*Schuck* v. *Myers,* 233 Cal.App.2d 151, 154 [43 Cal.Rptr. 215].)

THE ORDERS OF REFERENCE FOR THE ACCOUNTING
AND THE APPROVAL OF THE ACCOUNTING
WERE PROPER AND NOT ERRONEOUS

Appellants argue that the court's appointment of a referee to render an accounting was erroneous and unnecessary.

An interlocutory order for reference and accounting in a trust is a well established procedure supported by statutory and case law. (*Green* v. *Brooks,* 81 Cal. 328 [22 P. 849]; Code Civ. Proc., § 639; 1 Cal.Jur.2d 437; 2 Witkin, Cal. Procedure (1954) pp. 1649-1652.) In view of the apparent complexity of the accounting matters following the interlocutory decree, the order of a reference was appropriate and not an abuse of discretion. Proper procedures were carefully followed. The record shows that the court received the referee's report and took additional evidence. The objections that the report of the referee was inaccurate, contrary to law, arbi-

trary, capricious and incomplete, were all without proper itemization or specification of particulars.

Instead of specifying errors in the accounting, appellants repeat their blanket charge of unfairness and repeat arguments concerning Hillman's alleged incapacity and the lack of jurisdiction of the court, but concede that if Hillman was a beneficiary he would have the right to request an accounting.

Finally, contrary to appellants' contention, the referee and the court did allow reimbursement for all expenses appellants established in the management of the property.

## THE RECEIVERSHIP ORDERS WERE PROPER AND NECESSARY

Shortly after the litigation was commenced in 1960 and while the sister had possession of the property, a receiver was appointed to take over the property. He did so until 1963 when his final account was approved and he was discharged. Appellant asserts that various errors were committed in respect to (1) the receiver's appointment, (2) approval of leases, (3) the receiver's final account and discharge and (4) the replacement of the receiver by Muller and Woolpert, the conservators.

Technically, there is no proper appeal pending from the orders appointing and confirming the receiver. An order appointing a receiver is appealable. (42 Cal.Jur.2d 364.) An appeal was noticed after the receiver's appointment and subsequently was voluntarily withdrawn by the sister's counsel and ordered dismissed.

Appellants' arguments that there was no jurisdiction to appoint a receiver, are entirely without merit. Courts of equity have inherent power to appoint receivers in exercise of their equity jurisdiction. (42 Cal.Jur.2d 346-347.) The receivership was necessary. It was not a double charge because of the pending conservatorship. A conservator and a receiver have different functions. A receiver is a neutral court official while a conservator is a representative of a party. Here, the conservators did not have possession of the property; the receivership was necessary for the preservation of the property. The tenants were faced with the uncertainty resulting from the conflicting claims of appellants and respondent concerning their right to shares in the crops. In view of the perishable quality of the crops raised or grown on the ranch, the tenants could not wait for final judgment. The orders appointing and confirming the receivers are affirmed. The

receivers' administration was proper; no error was committed in the approval of the receivers' final account and their discharge.

■ It is well settled that a trial court has broad discretion in its directions and approvals given to a receiver in respect to management of the property. While appellants argue that the court abused its discretion in approving the leases, there is nothing in the record to support the contention that the receiver did not exercise diligence in making the new lease to Davis and in renewing the lease to Kester.

No evidence was presented showing that the leases were either unfavorable or unsatisfactory. (*Macmorris Sales Corp.* v. *Kozak*, 249 Cal.App.2d 998 [58 Cal.Rptr. 92].)

The claim that Hillman was not a proper party to the leases or their renewal or confirmation is simply a rehash of previous arguments concerning his capacity.

The substitution of the conservators in place of the retiring receiver was a reasonable exercise of discretion under the circumstances.

## RIGHT TO A JURY TRIAL

■ The pretrial order provided:

"This suit is one to (a) Determine title to real and personal property, (b) Impress a trust on said property, (c) Require an accounting of the handling of said properties, (d) Compel a conveyance and transfer of said real and personal property respectively from Defendants, Stults, to Plaintiff, Hillman, (e) Establish any outstanding leases and declare the rights and duties of litigants herein as to future rental payments on said leases. . . .

"The issue to be decided, by stipulation, between Plaintiff, Hillman, and Defendants, Stults, at a trial on this point alone is as follows:

"Did Plaintiff, Wayne Hillman, convey and transfer the real and personal property involved in this case, outright to Defendant, Genie H. Stults, by Deed and Bill of Sale on or about June 15, 1955, or did he convey and transfer the same to her in trust to be held by her subject to such trust? Defendants, Stults, contend the former; plaintiff the latter.

"The determination of this issue will decide whether or not there will be trial on the other causes of action set forth in paragraph numbered 2 above."

It is obvious from this order that this was an action to impress a trust. (*Angus* v. *Craven*, 132 Cal. 691 [64 P. 1091].) ■ An accounting action is an equitable remedy.

The right to money and possession of property was secondary to and flowed from the trust and accounting determinations.

A beneficiary cannot bring a quiet title action against a trustee. He must seek to enforce the trust and compel appropriate conveyances of legal title, or to compel the trustee to remedy the breach of trust. (*Ephraim* v. *Metropolitan Trust Co.*, 28 Cal.2d 824 [172 P.2d 501].)

Actions to establish and enforce trusts are traditionally equitable. (1 Witkin, Cal. Procedure (1954) p. 515.) The nature of the trust, the meaning or interpretation of its terms, as well as *the effect of those terms,* all are for the court to determine without a jury.

In the case of *Tibbitts* v. *Fife,* 162 Cal.App.2d 568 [328 P.2d 212], (petition for hearing denied), in a suit to establish a constructive trust, there was an oral agreement by the grantee to receive certain real property and to hold it until directed to convey it in a certain way; refusal to convey was alleged; it was prayed that a trust be imposed, an accounting made and a reconveyance ordered. The court held that historically those issues were cognizable only in equity and there was no right to a jury trial. When a judgment sought, although for money, requires the declaration of a trust the action is in equity, without right of jury trial. (*Woolsey* v. *Woolsey,* 121 Cal.App. 576, 580-581 [9 P.2d 605].)

### A Fair Trial

Appellants have attacked the trial judge for predetermining the case and conducting a trial which they allege was a sham and pretense. These unsupported attacks upon the trial judge are unjustified and are without merit. The trial judge's statement that he observed the demeanor of the witnesses, including that of the sister, he having presided over her deposition, was not prejudicial, particularly in view of the unusual context of the history of this litigation. The sister's testimony at the deposition undoubtedly influenced appellants' attorney in not producing her as a witness at the trial.

### The Denial of a Continuance Was an Appropriate Exercise of Discretion

The granting and denial of a continuance is usually a matter of discretion with the trial court. In this case, the past history of delay and absences by the sister made the denial of the continuance both reasonable and necessary. It is

**878**

apparent from the use of the depositions and the opportunity accorded appellants to supply affidavits and hearsay testimony through her husband as a substitute for her testimony that no prejudicial error resulted. There was no showing that the sister ever would have been available. She subsequently failed to appear at the accounting proceedings contrary to court order. Her death in 1966 appeared to confirm the trial court's judgment insisting that the trial proceed and in providing alternative methods to make her testimony available.[2]

### HILLMAN WAS A COMPETENT WITNESS

A prisoner may be a witness. (2 Witkin, Cal. Procedure, (1954) p. 1025.) The common law exclusion of prisoners as incompetent has been abolished in California. (Witkin, Cal. Evidence (2d ed. 1966) pp. 704, 705.)

Finally, assuming there was any problem of incompetency, which we do not, in 1963 the Adult Authority gave Hillman permission to substitute personally as a party plaintiff and ratified his prior appearances while he was on parole.

### THE ADMISSION OF TESTIMONY FROM THE CONSERVATORSHIP PROCEEDINGS

The trial court ordered that the depositions in the conservatorship proceedings could be used in both the conservatorship trial and the civil action. The transcripts therein were used by respondents to show the admission of appellants and their attorneys. While it is true that there was certain immaterial verbiage in these transcripts it was nonprejudicial.

### DISCLAIMER OF ADMISSIONS BY APPELLANTS' PRIOR ATTORNEYS

Appellants allege that the court erroneously failed to recognize appellants' disclaimer of admissions by her former attorneys.

An attorney may bind his client without the client's consent. It is well established law that the attorney has complete charge and supervision of the procedure that is to be adopted and pursued in the trial of an action and especially in what may be termed purely procedural matters. An attorney is fully authorized to bind his client. Nor is it disputed that " ' . . . the manner of trial [and all matters of procedure], and the like are within the sphere of his general

---

[2]Appellants' statement in their brief that the trial judge: ''In fact, forcing the case to go ahead without her was no doubt one of the things that aggravated her mental and physical condition, a heart ailment from which she later died,'' is both unsupported and unwarranted.

authority, and as to these matters his client is bound by his action.'" (*Zurich Gen. Acc. & Liab. Ins. Co., Ltd.* v. *Kinsler*, 12 Cal.2d 98, at pp. 105-107 [81 P.2d 913].)

██ An attorney may stipulate to include or limit issues or defenses to be tried. (*Bemer* v. *Bemer* (1957) 152 Cal.App. 2d 766, 771 [314 P.2d 714]; Witkin, Cal. Procedure (1954) 1967 Supp. pp. 24-25.)

There is nothing in the record to suggest bad faith or misjudgment on the part of appellants' previous attorneys who admitted that some type of trust or security agreement had been created for respondent's property while he was confined in prison. On the contrary, it affirmatively appears that their trial tactics and strategy, if followed, might have benefited appellants. The effect of withdrawing the issue of the trust and resting appellants' defense upon the issue of appellants' compensation and possible reimbursement was both honorable and tactically sound. The evidence of a trust was so overwhelming that appellants' attorneys had no other honorable practical course.

As the court stated in *Duffy* v. *Griffith Co.*, 206 Cal.App.2d 780, 787 [24 Cal.Rptr. 161], *"The trial* attorney is in full charge of his client's cause or defense . . . he must determine in the first instance what defenses shall be averred and what potential ones shall be omitted. At the trial he must have and exercise discretion to make such tactical decisions as the exigencies of the combat may dictate. His is the legal knowledge and skill that must be consulted in that connection, not the views of a layman; . . . Specifically his is the prerogative of withdrawing one of two defenses when he concludes that it *cannot be sustained* and that *its fruitless pursuit may prejudice the other sound defense"* (Italics added.)

There were many documentary and testimonial admissions by both appellants which were more than enough to sustain the trial judge's determination without the admissions of the attorneys. Appellants' prior attorneys acted in accordance with the highest standards of the bar, both as officers of the court and advocates for their clients. The court's ruling was correct.

### DISQUALIFICATION OF RESPONDENT'S ATTORNEYS

During the trial, appellants made a motion for disqualification of Muller and Woolpert as attorneys and conservators but later they withdrew their appeal. Although technically improper, they attempt to renew the appeal and contend that

attorneys Muller and Woolpert should have been disqualified because of an alleged prior confidential relationship with appellants and "champertous" conduct.

■ An order denying a motion to restrain and enjoin former attorneys from representing adverse parties is appeal-able. (*Meehan* v. *Hopps*, 45 Cal.2d 213 [288 P.2d 267].) A voluntary dismissal of the appeal acts as an affirmation of the order, making it res judicata. (*Conservatorship of Oliver*, 203 Cal.App.2d 678 [22 Cal.Rptr. 111]; Code Civ. Proc., § 955.)

■ In any event we shall consider the argument on its merits. Muller and Woolpert both were employed as attorneys of record for Hillman, not the sister. They dealt directly with Hillman and had previously represented him.

If Muller and Woolpert had been untrue to their duty to respondent and subject to the sister's dominion, the suit herein would not have been accomplished. They did not represent the sister until after they had become Hillman's attorneys, and then only on a matter in which the sister's attorney Cornish associated them to assist him, and in two isolated matters, none of which involved any conflict of interest or confidential communications.

The sister paid respondent's obligations, but as trustee having possession of his property. Even if the sister had the status of a co-principal with Hillman, there would be no conflict in later representing Hillman. (*Croce* v. *Superior Court*, 21 Cal.App.2d 18 [68 P.2d 369]; *Petty* v. *Superior Court*, 116 Cal.App.2d 20 [253 P.2d 28]; *Arden* v. *State Bar*, 52 Cal.2d 310, 318 [341 P.2d 6].)

It is clear from the evidence that Muller and Woolpert did not act secretly; they did not switch sides; they were forced to institute the conservatorship proceedings and the litigation because the voluntary accounting efforts were not successful. They received no confidential information from the sister while representing Hillman and in fact if they had not proceeded in the manner in which they did they would have been guilty of a breach of their professional duties to Hillman.

FINDINGS AND CONCLUSIONS

Appellants' attacks upon the findings and conclusions are largely a repetition of points discussed above. Appellants made no requests for special findings or conclusions under Code of Civil Procedure, section 634. Accordingly, implied findings may be considered by this court.

The old rule permitting implied findings applies. (*Ruppert* v. *Jackson*, 212 Cal.App.2d 678 [28 Cal.Rptr. 467].)

The findings are consistent, clear and complete and supported by the evidence. As the court stated in *Spindler Realty Corp.* v. *Monning,* 243 Cal.App.2d 255, at p. 275 [53 Cal.Rptr. 7]:

''The court made extensive findings as to all material facts necessary to support the judgments. In the absence of a written request for a specific finding 'as provided in section 634, a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made.' ''

The trial judge's determinations of the trust and his findings and conclusions in support therein cover expressly or by implication all essential factual and legal issues.

## NONSUIT AND DISMISSAL

Appellant Walter Stults alleges that the court committed error in failing to give him a judgment for nonsuit and costs. The complaint named both appellants as husband and wife, alleging that the wife took the title in trust, but that both husband and wife participated in the leasing, managing and operation of the property. While the main suit was against the sister as trustee, the prayer sought to have the property returned by joint deed. The defendants, husband and wife, filed a joint answer and admitted they had jointly leased and managed the property.

At the end of plaintiff's case, appellant Walter Stults incorrectly made a motion for nonsuit under Code of Civil Procedure, section 581c. As a nonjury trial, it should have been made under Code of Civil Procedure, section 631.8 and appropriate findings and conclusions should have been submitted. Any possible error in procedure was appellants'. In any event, it was cured by the judgment. Aside from the failure to submit to findings and conclusions, it is apparent from the colloquy between court and counsel that the motion for nonsuit as to appellant Walter Stults was granted on the issue of title only and he remained in the case because of the court's anticipation of other possible claims and fees involved in the trust. Any appeal from a denial of a dismissal from the purported nonsuit would be a nonappealable order and it was clear throughout the accounting portion of the trial that the appellant Walter Stults was still making a personal claim for his services.

In regard to the claim for costs, this was an equity

case. Under section 1032 subdivision (c) of the Code of Civil Procedure, the court had discretion in its determination of costs. (See 3 Witkin, Cal. Procedure (1954) p. 1907.) Appellant Stults had no absolute right to costs because he was not fully successful in the litigation.

## SANCTIONS

During the course of litigation respondent made requests for admission of genuineness of documents and of facts, seeking admissions as to the trust status, income, expenses and balances. After a substantial period of delay appellants filed denials, partial denials or made evasive or hedging answers. Following a notice of motion the trial court made an order directing respondent's sister to pay respondent $40,000 in connection with the title portion of the case and $20,000 for the proof of the accounting portion. The request for admission and responses of appellants may be summarized as follows:

A request for the admission of the genuineness of the June 9, 1955 trust letter and an admission that it was signed by respondent's sister—was denied. Delivery of the letter to respondent was denied. It was denied that respondent had consent or authority to retain it. It was denied that the letter constituted the trust agreement or was intended to be a trust agreement. It was denied that attorney Cornish represented respondent's sister in business contacts with respondent. It was denied on information and belief that a covering letter concerning the last letter from Cornish to respondent was true and correct. It was denied that the June 9, 1955 letter was sent by Cornish with a proposed deed and bill of sale. Statements of attorneys Cornish and Hagerty at the conservatorship hearings wherein they admitted a trust or security arrangement, were denied. The accuracy of the transcript was denied. Cornish's authority was denied and it was denied that he represented the sister's position. The accuracy of the transcript wherein admissions were made by the sister was denied. The truth of the statements was also denied. Later in another response the sister admitted that Cornish represented her but stated it was only to contest jurisdiction for the appointment of a conservator and all other representation authority was denied.

In response to requests for admission of facts appellant, Genie Stults, denied the accuracy of figures showing a one-third ownership of crops grown by the tenant. Appellant

stated ''From all information I have in my possession I know some of these figures are incorrect and believe they are all incorrect.'' Appellant stated she was unable to check the accuracy of the owner's share of per hundred weight figures for barley and wheat sold. In response to a request or suggestion that additional unreported income was received, appellant replied that the accounting covers ''all income and is correct.'' She stated that it was incorrect that the receipts exceeded expenditures. She denied that the expenditures listed in the accounting were in part personal. She stated that any calves born would be reflected in income from cattle shown in the accounting.

The trial court found '' [T]hat the admissions sought were of substantial importance in this action in both the title and the accounting portions thereof; that there were no good reasons for such denials; that though there was a contest of said matters said contest was neither real nor serious; that said matters were not difficult to resolve if defendant had not sought to evade the ascertainment of the truth; that as to the title phase of the requests, the matter of title was crystal clear; that as to the accounting portions of said request, said accounting information was available to said defendant and within her personal knowledge; that without any good cause whatsoever she filed false denials which placed upon plaintiff pursuits of evidence and truth that need not have been placed upon him at all, but instead, as found in other portions of this case, the denials were part of a course of conduct on the part of said defendant and her husband which were delaying actions, with the tools of the law being used by her and her husband, not for the purposes for which they were intended but just to force some settlement out of plaintiff; that at the trial of this action plaintiff proved the genuineness of said documents and the truth of said matters of fact through examination and cross-examination of witnesses and the introduction of evidence; that the evidence and proof has been presented to this court over a period of years. . . .

''Proof having been made to the Court, the Court further finds that plaintiff has incurred *reasonable expenses, including reasonable attorneys'* fees, in making said proof, which fees as hereinafter specified are found to be minimum in view of the evidence . . .'' (Italics added.)

Code of Civil Procedure, section 2034, subdivision (c) provides in straightforward language that if after a request for

an admission of substantial importance, a denial is made without any good reason, the party seeking the admission may "apply to the court in the same action for an order requiring the other party to pay him the reasonable expenses incurred in making such proof, including reasonable attorney's fees." Obviously, this means that the motion must be made in most cases after the proof, to wit: after the trial.

Appellants' counsel has construed the nature of sanctions awarded for unwarranted denial of a request for admissions as similar to misconduct concerning depositions and interrogatories. As stated in DeMeo, California Deposition and Discovery Practice, page 386, the sections do not provide for penalties but for reimbursement of expenses for going to trial as a result of the unfounded and unjustified denials. Reimbursement or compensation is what the trial judge awarded.

 Nor is there any merit to appellants' arguments attacking the constitutionality of sanction provisions.

It is clear that the most drastic sanction of all, the striking of an answer for refusal to comply with the discovery statutes, does not deny due process and is constitutional if exercised with discretion. (*Unger* v. *Los Angeles Transit Lines,* 180 Cal.App.2d 172, 186 [4 Cal.Rptr. 370, 5 Cal.Rptr. 71] ; 23 Am.Jur.2d p. 479.) Punishment is not to be the objective. (*Caryl Richards, Inc.* v. *Superior Court,* 188 Cal.App.2d 300 [10 Cal.Rptr. 377].)

 "It is a general rule that reasonable costs may be imposed on litigants without violating these constitutional guaranties; the constitutional right to obtain justice freely and without purchase is not the right to have judicial proceedings carried on without expense to the parties, in the form of reasonable, legally prescribed fees or costs, . . ." (16 Am.Jur.2d 719-720.)

 "And a state may allow the recovery of attorneys' fees in special classes of proceedings, but withhold them in others. Of course, there is little question of the validity of the allowance if attorneys' fees are made a part of the costs and granted to the winning party, whether plaintiff or defendant, in a group forming a proper subject of classification." (20 Am.Jur.2d 66.)

The participants in the 1967 State Bar Convention Panel on the subject, *Civil Discovery Tool or Weapon,* generally agreed that requests for admissions are designed primarily to expedite the trial or disposition of the lawsuit and if properly

used can cut the cost of a lawsuit to a great degree. Certainly with the skyrocketing costs in the administration of justice, the bench and bar have an obligation to utilize legislative tools granted to expedite justice within constitutional limits. The success of the statutory admission procedure will depend in a large measure on the willingness of the courts to enforce the sanctions for the failure to show good faith in response to a request for admission.

As a result of the unfounded denials in bad faith and without good cause by appellants, this litigation has been subjected to interminable delays, all with the ultimate effect of obstructing the administration of justice and depleting the property for which respondent's sister was a fiduciary. The history of changes in position, and attorneys, all sustain the trial judge's conclusion that the trust matter was litigated as a result of unfounded denials and the accounting matter was prolonged and obstructed without good cause.

The requests to the sister were directed to factual matters of which she had positive knowledge: (1) The existence of the letter signed by her creating the trust; (2) her representations to attorneys Cornish and Hagerty; (3) the operations of the ranch which were directly administered by her; and (4) the amount of income and expenses she handled during the time she operated the property; and (5) the accounts were personally recorded by her. After more than four years of operation of the properties as a trust, in bad faith, she denied the existence of the trust and engaged in dilatory and evasive tactics throughout the litigation. The trial judge's finding that her position was taken in bad faith and the existence of the trust was crystal clear, is amply supported by the evidence. Her position was untenable and without foundation in fact or in law.

The federal and the California rules are designed to compel admission of matters which cannot reasonably be contradicted. The plain language of the admission sections makes it apparent that they were enacted to eliminate the necessity of putting on formal proof of essentially uncontroverted facts, not as a substitute for trial of genuinely disputed facts. The sections are not a discovery device. Compliance avoids the necessity of proving what is assumed the requesting party will be able to prove. It is no objection that the requesting party already knows the truth of the matter. (See 4 Moore's Federal Practice, pp. 2717-2718, discussing similar federal

rules; *Haseltine* v. *Haseltine*, 203 Cal.App.2d 48 [21 Cal.Rptr. 238].)

Of course, a serious and real contest as to the subject matter of a requested admission constitutes "good cause." (*Chodos* v. *Superior Court*, 215 Cal.App.2d 318, 324 [30 Cal.Rptr. 303].)

Here, the sister because of her brother's incarcerated status, had a particularly high duty not to force respondent to litigate matters specially within her knowledge, particularly when she had possession and control of all of his property and resources.

In *Water Hammer Arrestor Corp.* v. *Tower* (E.D. Wis. 1943) 7 F.R. Serv. 36a.58, Case 1; sc (E.D. Wis. 1947) 7 F.R.D. 620, 10 F.R. Serv. 37c.1, Case 1, "defendant, a former patent attorney for plaintiff, who had obtained a patent in his own name on a device revealed to him by plaintiff, was *under a high duty not to put the plaintiff to any unusual or unnecessary expense in his proof* and was taxed $1,000 as part of plaintiff's attorney's fees and disbursements because of failure to *answer certain requests and the giving of hedging answers to others.* This decision was reversed on the ground that costs and expenses cannot be assessed under the rule for failure to answer" (distinguished from an unwarranted denial). (Italics added; 4 Moore's Federal Practice, p. 2759.)

To sustain the trial court's order it must be determined whether the trust reasonably could be controverted and whether the accounting and its accuracy therein was a reasonable subject of dispute. To put it another way, was there good cause to try the trust issue and was there good cause to try the accounting issue?

It appears from the evidence in the trust phase of the case that there was no genuine issue of fact concerning the genuineness of the June 9, 1955, letter, or its delivery to respondent. Originally, appellant's sister and her attorneys, Cornish and Hagarty, both admitted the trust. The theories advanced by attorneys Cornish and Hagarty were different than those advanced by attorney Davis, but these three attorneys agreed that the parties intended some type of trust or security agreement until respondent's release from the penitentiary.

Cornish admitted the trust and the accompanying letter therein. On other occasions he admitted that the transfer of title to the property was a security for respondent's sister.

During the conservator hearings, the sister made judicial admissions that she was operating the ranches for her brother. In defendant's Exhibit 16, attorney Davis stated in a letter dated July 9, 1960, ''that the intent at the time of delivery of title from Wayne Hillman to Genie Stults was that such title would be absolute in Genie Stults until Wayne Hillman's release from confinement.''

The trial of the title phase of the litigation lasted from May 17, 1962, to June 1, 1962. While much of the testimony was involved in a description of the events leading up to the meetings at Chino and the execution and delivery of the letters, we think the trial judge's order for an award of $40,000 fees was excessive. Proof of the genuineness of respondent's sister's signature was not difficult nor was there any inherent difficulty in proving delivery of the document.

It is apparent that while there was no genuine dispute concerning the letter of June 9, 1955, there were issues concerning the trust and the legal effect of the transfer of property in June 1955. While the denial of the genuineness of the June 9 letter and the denial of the earlier admissions by respondent's sister and her attorneys was without good cause, there was good cause to litigate the meaning of the letter, the type of trust involved and an accounting.

Under a theory of a beneficial holding, some type of a trust would have been necessary. Here, accepting the highest good faith on the part of the sister, due to the fact that the sister's ranch and respondent's ranch were adjoining properties and there might be some consequent informality in the family administration, a certain amount of disentanglement might be required in the accounting process.

Of course, since admission requests are made for the purpose of expediting the trial, the ''fact that the request is for the admission of a controversial matter, or one involving complex facts, or calls for an opinion, is of no moment.'' (*Cembrook* v. *Superior Court*, 56 Cal.2d 423, 429 [15 Cal. Rptr. 127, 364 P.2d 303].) Accepting respondent's version which we have, that a trust was set up to assist him in the administration of his property while he was incarcerated and for the preservation of his property, an accounting was probably necessary. In fact, for a time it appeared that the parties were going to agree to a voluntary accounting. But this does not justify the sister's deliberate attempts to obstruct, mutilate or conceal the accounting records.

Although there are situations where a trustee does not have personal information concerning accounting practices or expenditures, the request for admissions here in most cases covered precise matters easily subject to ascertainment, such as grain and income figures, birth of livestock on the ranch and final balances.

Not only did respondent's sister change her position as to whether or not a trust existed, she changed her position concerning the accuracy of the accounting and her familiarity with it.

After the voluntary efforts of plaintiff to obtain an accounting had failed and after a substantial period of delay, respondent's attorneys warned appellants of the possible consequences of the delay. Appellants' attorneys replied that if the accounting was incorrect plaintiff would be entitled to the compensation for the cost of proving it under Code of Civil Procedure section 2033.

The evidence indicates that the sister personally kept the books and was aware of the money spent and the money taken in. Checks, memoranda and daily reminder utilized by the sister during her administration were mutilated or destroyed for the purpose of concealing the evidence of the trust or for the purpose of concealing the mixing of accounts. The evidence indicates that the sister concealed the extent of the income from the ranch by a large amount, overstated her expenses and included her personal expenses with the trust expenses. Sanctions were proper and necessary under both the title and accounting phases of the case.

## THE AMOUNT OF THE SANCTIONS

If sanction provisions are to accomplish the legislative purpose they must be enforced with a full understanding by the bench and bar of their purpose and the reasons they are imposed. ■■■ One purpose is to expedite trials and prevent unnecessary delay. (*Cembrook* v. *Superior Court, supra,* 56 Cal.2d 423 at p. 429.) In the case at bench, the trial judge could properly conclude that the denials or partial denials in both phases of the case did not fairly meet the substance of the requested admissions or were not phrased in good faith. Sanctions were necessary because of the resulting extended litigation to prove these unfounded denials or partial denials.

Years of litigation were necessary because of the false or misleading answers to requests for admissions. The requests were clear and capable of being admitted or distinguished with reasonable qualifications.

 We must now determine whether the amounts imposed by the trial judge were reasonable and not an abuse of discretion. Of course, we recognize that our inquiry is limited to a determination of whether the trial judge committed an abuse of discretion. (*Haseltine* v. *Haseltine, supra.*)

In the case of *Petersen* v. *City of Vallejo,* 259 Cal.App.2d 757 at pp. 781-782 [66 Cal.Rptr. 776], the court stated: "The plaintiffs have the burden of showing an abuse of the trial court's discretion. (*Weinkauf* v. *Superior Court* (1966) 64 Cal.2d 662, 665 [51 Cal.Rptr. 100, 414 P.2d 36]; and see *Rosen* v. *Superior Court* (1966) 244 Cal.App.2d 586, 594 [53 Cal.Rptr. 347]; and *Crummer* v. *Beeler* (1960) 185 Cal.App. 2d 851, 858 [8 Cal.Rptr. 698].)

"The applicable principles have been set forth in *Caryl Richards, Inc.* v. *Superior Court* (1961) 188 Cal.App.2d 300 [10 Cal.Rptr. 377] as follows: 'One of the principal purposes of the Discovery Act (Code Civ. Proc. §§ 2016-2035) is to enable a party to obtain evidence in the control of his adversary in order to further the efficient, economical disposition of cases according to right and justice *on the merits.* (41 Mich. L.Rev. 205; 50 Yale Law Journal 711; *Pettie* v. *Superior Court,* 178 Cal.App.2d 680, 689 [3 Cal.Rptr. 267] [citation].) Its purpose is not "to provide a weapon for punishment, forfeiture and the avoidance of a trial on the merits." (*Crummer* v. *Beeler,* 185 Cal.App.2d 851, 858 [8 Cal.Rptr. 698]; *Mitchell* v. *Johnson,* 274 F.2d 394.)

"'The statute is to be liberally interpreted so that it may accomplish its purpose. The trial court has a wide discretion in granting discovery and by the provisions of section 2034 of the Code of Civil Procedure it is granted broad discretionary powers to enforce its orders but its powers are not unlimited. . . .

" ' . . . . . . . . . . .

"'The sanctions the court may impose are such as are suitable and necessary to enable the party seeking discovery to obtain the objects of the discovery he seeks but the court may not impose sanctions which are designed not to accomplish the objects of the discovery but to impose punishment . . . ' "

 While the trial of this case must have been extremely trying for the judge, he handled all phases of the litigation in accordance with the highest standards of judicial performance, integrity and patience. We feel that under all of the circumstances the amount imposed for both phases of litiga-

tion was excessive due to the fact that it appears that the fees set were for the entire litigation, when certain phases, particularly matters of law, and the extent of the proof involving some matters which were cumulative, might have been subject to reasonable dispute.

Appellants have made no serious objection to the reasonableness of the amounts awarded. Mr. Lavine stated at the hearing for determination of fees "My claim [for fees] would be at least as high as Mr. Woolpert on the major portion of the case." He stated that he would not have done the work that Mr. Woolpert did for any less than $50,000. He might even ask for *$65,000 in view of the size of the property* and work.

As to the accounting portion of the case, Mr. Lavine thought that a fair fee would be between $10,000 and $15,000. Of course, the fee for the entire case would not necessarily be the fee imposed for expenses reasonably required to prove facts improperly denied.

. While there is clearly a need for adequate sanctions to be imposed in this case, we think the sum of $60,000 under all the circumstances was excessive. An amount in the sum of $20,000 for the expenses incurred in proof of the title and $10,000 for the expenses incurred in proof of the accounting is reasonable and proper.

This court has the power to set the reasonable fee without a remand. In *Kirk* v. *Culley* (1927) 202 Cal. 501 [261 P. 994], the trial court awarded the contract sum as a fee, the Supreme Court determined that the fee was awarded under an erroneous theory, exercised its fact finding power and determined the fee from the evidence and modified the judgment accordingly. (*Estate of Iser* (1921) 52 Cal.App. 405, 408 [198 P. 1014]; 1 Witkin, Cal. Procedure (1954) p. 42.)

"In *Boller* v. *Signal Oil & Gas Co.* (1964) 230 C.A.2d 648, 41 C.R. 206, plaintiff, an outstanding expert in property tax litigation, was engaged to handle a difficult appeal, and did so successfully. In this action for the reasonable value of his services the trial judge fixed them at $7,500, observing that plaintiff had devoted more time than was warranted, and that the case was one which did not involve the expertise which plaintiff admittedly had. *Held*, the court was wrong in both of these assumptions. But the judgment was not reversed for a retrial: The expert testimony in the record indicated that $17,500 was a proper sum. And, 'since this court possesses the same basic expertise with regard to counsel fees as does a trial

court,' its factfinding power (see Appeal, § 193) was exercised by making a finding of $17,500 as the reasonable value of the services, and the judgment was modified accordingly. (230 C.A.2d 656.)'' (Witkin, Cal. Procedure, 1967 Supp., p. 21.)

The orders and judgments are affirmed except that the amount of sanctions imposed in the judgment are reduced to the sums of $20,000 and $10,000 respectively. Costs for respondent.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied August 5, 1968, and appellant's petition for a hearing by the Supreme Court was denied September 5, 1968.