No. 75,329

In the Matter of KEEN K. BRANTLEY, *Respondent.*
(920 P.2d 433)

Opinion filed July 26, 1996.

*Marty M. Snyder*, deputy disciplinary administrator, argued the cause and was on the brief for petitioner.

*Keen K. Brantley* argued the cause and was on the brief pro se.

*Per Curiam:* This is an original proceeding in attorney discipline in which respondent, Keen K. Brantley, has filed exceptions to the report of the hearing panel of the Kansas Board for Discipline of Attorneys, which recommended published censure. The panel found violations of MRPC 1.1 (Competence) (1995 Kan. Ct. R. Annot. 251), 1.2 (Scope of Representation) (1995 Kan. Ct. R. Annot. 255), 1.4 (Communication) (1995 Kan. Ct. R. Annot. 263), 1.5 (Fees) (1995 Kan. Ct. R. Annot. 268), 1.7 (Conflict of Interest: General Rule) (1995 Kan. Ct. R. Annot. 275), 1.9 (Conflict of Interest: Former Client) (1995 Kan. Ct. R. Annot. 281), 1.14 (Client under Disability) (1995 Kan. Ct. R. Annot. 293), 3.3 (Candor Toward the Tribunal) (1995 Kan. Ct. R. Annot. 311) and 8.4 (Misconduct) (1995 Kan. Ct. R. Annot. 340). Our jurisdiction is under Rule 212 (1995 Kan. Ct. R. Annot. 214).

The issue is whether the findings and recommendations of the panel are amply sustained by the evidence and should be adopted by this court. We adopt the recommendation of the panel and impose published censure. In addition, we order restitution, as set forth below. We determine that the findings of misconduct are established by clear and convincing evidence.

## FACTS

The panel's findings of fact and conclusions included in its report are reproduced below. Brantley filed exceptions to several findings of fact (Nos. 6, 12, 17, 19, 21, 22, 23, 24, 27, 28, 31, and 32), and conclusions (Nos. 2 through 10). Brantley's exceptions or responses are set out in italics after certain findings of fact or addressed in

our discussion. Observations gleaned from the record have been interspersed throughout the panel's findings and identified in brackets.

After his initial telephone call to Mary Storm at her nursing home, Brantley neither met personally nor had any direct communication with the elderly widow, whose Dickensian dilemma is addressed in our opinion.

## "FINDINGS OF FACT

"1. Respondent, Keen K. Brantley, is a licensed Kansas attorney who has engaged in the general practice of law in Scott City, Kansas, since 1970. . . .

"2. The complainant is Carla Hendrix, granddaughter of Mary Storm, a ninety-one year old resident of Anchorage, Alaska, who formerly resided in Scott City, Kansas. Following the death of her personal attorney, Charles Fleming, Mary Storm became a client of the Respondent in 1983. During the time in question, Mary Storm had done most of her banking business at the First National Bank of Scott City but had done some business at the Security State Bank in Scott City. At no time has Mary Storm ever been found to be incompetent, incapacitated or disabled by any medical person or court in Kansas or Alaska.

"3. In 1977, Mary Storm's husband, R. E. Pfenninger, died leaving his entire estate to her under a joint and mutual will. The estate was valued at some $77,000.00. Under the terms of the will, any property remaining at Mary Storm's death was to be divided equally between the surviving children of Mr. Pfenninger by a previous marriage and Mary Storm's only child, Wayne Hendrix, by a prior marriage.

"4. In 1985, Mary's brother, Leo Scott McCormick, died leaving his entire estate to Mary Storm, the only surviving McCormick sibling. The McCormick estate was valued at approximately $193,000.00. The First National Bank of Scott City was the executor and was represented by Respondent.Brantley and his firm.

"5. In February 1986, Mary Storm wrote a letter to her son, Wayne Hendrix, and his wife Delores stating, among other things, that her brother's estate would be settled soon and that most of

the estate would go to Wayne as she did not need it. She further observed that she and Wayne were the only surviving family members.

"**6.** Following the distribution of the McCormick estate, during the period April 1986, through July 1987, Mary Storm, from time to time, deposited sums of money in a savings account that her son and daughter-in-law had opened at Security State Bank in Scott City, Kansas. Mary Storm wrote seven different checks for deposit to their account over the fifteen month period totalling $191,425.00. Mary Storm's name was not on the Hendrix account, and at no time did Wayne or Delores Hendrix transfer any of Mary Storm's money into their account. During this period of time, Mary Storm, with the assistance of Respondent Brantley, caused Wayne Hendrix's name to be added as a joint tenant to several of her certificates of deposit and parcels of inherited real estate. At no time has Wayne or Delores Hendrix attempted to exercise any right of ownership to the certificates of deposit or the several parcels of real estate or the income therefrom.

[We observe that the record does not show who made the deposits to the Hendrix account, although it is likely that Mary Storm made the deposits up until she broke her hip in December 1986. Prior to that time, Mary Storm made at least monthly visits to Security State Bank. Most of the deposits were made before her injury. Wayne Hendrix may have made deposits after Mary broke her hip. Also, not all of the deposits were from checks signed by Mary Storm and payable to Wayne Hendrix.]

[On April 28, 1986, Mary Storm wrote two checks to Wayne in the amount of $30,000 each. One of the $30,000 checks had a specific reference to the Scott McCormick Estate. On August 15, 1986, a First National Bank of Scott City money order for $20,000 was deposited into the Hendrix account. The money order had a reference to "Mary Storm's loan proceeds." On October 27, 1986, a First National Bank of Scott City money order payable to Security State Bank was purchased for $41,562.74 and deposited in the Hendrix account. It had a reference to the Scott McCormick estate. On February 9, 1987, a check in Wayne Hendrix's handwriting but signed by Mary Storm and payable to Wayne in the amount of

$15,000 was deposited in the Hendrix account. Wayne was also jointly on Mary Storm's checking account at Security State Bank. On May 1, 1987, Wayne wrote a check in the amount of $2,000 on Mary Storm's checking account for travelers' checks. On July 13, 1987, a check payable to Mary Storm from Railway Savings and Loan in the amount of $52,862.88 was deposited in the Hendrix account.]

[Brantley admitted assisting Mary Storm in placing her three real estate installment contracts in joint tenancy with Wayne, but denied involvement in placing Wayne's name on any of Mary Storm's certificates of deposit as a joint owner.]

"7. From October 1986, through January 1988, the Hendrixes authorized wire transfers in the total amount of $85,000.00 from their Scott City account to their credit union account in Alaska, where they then resided.

"8. In December 1986, Mary Storm fell and fractured her hip, which injury required a period of hospitalization followed by nursing home care. Prior to such injury Mary Storm had lived in her own home, had driven her own car, and had been self-sufficient.

"9. Mary Storm continued to reside in a nursing home, and in July 1989, she was visited by her step-son, Ralph Pfenninger, who resided in Oklahoma. During this visit, Mr. Pfenninger states that he was advised by the nursing home administrator that Mary Storm was giving all of her money away and would soon have nothing to live on. As a matter of fact, Mary Storm had more than $100,000.00 in liquid assets and a comfortable income.

"10. Ralph Pfenninger also visited with an officer of the Security State Bank of Scott City [Louise Wendler], who advised him that there had been some large transfers of funds from Mary Storm to her son, Wayne Hendrix.

"11. Ralph Pfenninger then met with Respondent Brantley and expressed his concerns relative to the feared dissipation of Mary Storm's assets. Respondent Brantley was informed that the Security State Bank of Scott City had indicated a willingness to serve as conservator, and he thereupon conferred with Louise Wendler, a Vice President of Security State Bank, who further confirmed to him confidential information that Wayne and Delores Hendrix had

made transfers from *their* Kansas account to *their* Alaska account totalling $85,000.00. Ms. Wendler further volunteered that, in her opinion, Mary Storm's deposits into the Hendrixs' account could not possibly be gifts due to their large amount. She admitted, however, that she had never consulted Mary Storm about this assumption.

"**12**. Respondent Brantley never met personally with Mary Storm regarding the voluntary conservatorship but recalls that he talked by telephone with her at the nursing home and inquired if she was aware that Wayne Hendrix was in town withdrawing large amounts from her bank accounts. Understandably, Mary Storm replied that she knew nothing about any recent withdrawals from her accounts. Bank records in evidence reflect that she was correct in her reply.

[Brantley's version of the telephone conversation with Mary Storm indicates:

*"Respondent called Mary Storm at Park Lane Nursing Home and told Mary he had learned from Louise Wendler and Ralph Pfenninger that there had been substantial deposits of her funds by Wayne to his account while he was in Scott City and was she aware of these. Mary Storm replied she was not aware of any transfers or deposits. Respondent asked Mary Storm if she had intended that her funds be deposited in Wayne's account. She stated she intended her funds pass to Wayne after her death but not while she lived. Mary Storm mentioned that Wayne was on her checking account as a joint tenant for that reason."*]

"**13**. Without further investigating the reported transfers of Mary Storm's assets, and without further personal conversation with Mary Storm, Respondent Brantley caused voluntary conservatorship proceedings to be prepared and sent the same to the nursing home for Mary Storm's signature with an office employee. The Security State Bank was appointed conservator under the voluntary conservatorship proceeding on July 11, 1989. Respondent Brantley candidly admits that, at this time, he was representing the conservatee, Mary Storm; her step-son, Ralph Pfenninger; and the conservator, Security State Bank, all in the same proceeding.

"**14.** The conservatorship operated without event until September 21, 1989, when Respondent Brantley filed a Petition for Sale of Personal Property at Public Auction. Respondent Brantley prepared such pleadings for his client Security State Bank. The Petition was set for hearing on September 29, 1989, and copy of notice of hearing was reportedly mailed to Mary Storm. On September 22, 1989, Respondent Brantley filed a Petition for Appointment of Guardian ad Litem. The proposed guardian ad litem, William Wright, was not known to Mary Storm. As in the case of the Petition for Sale, Mary Storm was not consulted in connection with the Petition for Appointment of Guardian ad Litem.

"**15.** Prior to the hearing on the Petition to Sell Personal Property and without court authorization or Mary Storm's knowledge, the Security State Bank contacted an auction company in early September and caused Mary Storm's personal property to be boxed and inventoried. Further, auction handbills were caused to be posted in Scott City and advertisements for sale placed in the local newspaper. Without court approval of the sale, the Security State Bank paid the auction company $450.00 out of Mary Storm's conservatorship funds on September 28, 1989, a day before the hearing.

"**16.** The above mentioned Petition for Sale of Personal Property at Public Auction, prepared by Respondent Brantley, contained an allegation, 'It is necessary to sell said personal property to pay taxes and expenses of the conservatorship.' The allegation, which is untrue, was verified on behalf of the conservator, Security State Bank.

"**17.** Mary Storm's grandson, Richard Hendrix of WaKeeney, Kansas, was alerted by one of Mary Storm's neighbors a week before the proposed auction. He contacted WaKeeney attorney Paul Oller in regard to representing Mary Storm in having the sale halted. Mary Storm subsequently retained Paul Oller to represent her and instructed him to have the sale stopped and the conservatorship terminated.

"**18.** At the September 29, 1989, hearing on Mary Storm's Petition for Termination of Conservatorship, the voluntary conservatorship was terminated and the Petition to Sell Personal Property was denied.

"**19**. Later, on the same day, Respondent Brantley presented to the magistrate judge, ex parte, a Temporary Order restraining the disposition of the estate of the 'conservatee' until the 'petition' could be heard and further orders issued. No notice was given to Mary Storm or her attorney, Paul Oller. The Temporary Order was filed at 4:20 o'clock p.m. on September 29, 1989.

"**20**. The above noted Temporary Order contained the caption of the previously terminated voluntary conservatorship proceeding. The order contained no explanation or justification for having been filed in a closed case. The Temporary Order was also silent as to the identity of the client being represented by Respondent Brantley in such matter.

"**21**. The Temporary Order stated that there should be no further disposition or depletion of the estate of the conservatee at a time when there was no conservatee and no conservatee estate. The Temporary Order prepared by Respondent Brantley further provided that the Temporary Restraining Order would continue in effect until the petition could be heard and further orders of the court issued, all at a time when there was no petition on file. In preparing and filing such order, Respondent Brantley was not following the direction of his purported client Mary Storm, and was acting adversely to her.

"**22**. On October 2, 1989, Respondent Brantley filed an Involuntary Petition for Appointment of Conservator, on which petition he shows himself as attorney for the Petitioner, Ralph Pfenninger. At no time did Respondent consult with his purported client Mary Storm, or obtain her consent to his materially adverse representation of her step-son.

"**23**. The Petition for Involuntary Conservatorship, prepared by Respondent Brantley for his client Ralph Pfenninger, stated that Mary Storm was 'completely disoriented as to person, place and time as noted in the letter of Daniel R. Dunn, M.D. marked Exhibit A attached hereto and made a part hereof.' In fact, there was no Exhibit A attached to the petition, there was not in existence any letter from Dr. Dunn, Respondent Brantley never contacted Dr. Dunn to request such a letter, and Respondent Brantley candidly admitted that he made up the language supposedly 'noted in

the letter.' At no time during any of the conservatorship proceedings did the Respondent ever meet personally with Mary Storm to determine for himself her state of mind or knowledge of her financial affairs, and his false statements contained in said petition have never been corrected.

"24. On October 3, 1989, Respondent Brantley obtained Preliminary Orders which he had prepared on behalf of his client Ralph Pfenninger. On October 10, 1989, Mary Storm, through her attorney, Paul Oller, filed Answer of Proposed Conservatee, which answer raised multiple objections to Respondent Brantley's continued representation adverse to Mary Storm and listed numerous violations of the Model Rules of Professional Conduct. The answer further requested an accounting of all funds received by and spent by the conservator and requested disqualification of Respondent Brantley and discharge of the court appointed attorney. Respondent Brantley did not file a response or withdraw from the adverse representation.

"25. Purportedly at the request of the court appointed attorney for Mary Storm, William Wright, the magistrate judge undertook to interview Mary Storm at the nursing home without any notice to interested parties. Later, he undertook to interview Mary Storm a second time in a Garden City hospital where she was recovering from recent cancer surgery. At the hospital visitation, the magistrate was accompanied by a court reporter. Again, the visitation was without notice to Mary Storm's family or her retained attorney of record. On October 12, 1989, the day following her cancer surgery, the magistrate judge dismissed Mary Storm's granddaughter from the hospital room and proceeded to interrogate Mary Storm. While not within the purview of the panel, the panel is shocked that a magistrate judge would undertake to interrogate an elderly person on the day following major surgery. [Mary Storm was recovering from a mastectomy and was not in a position to answer questions about the conservatorship. She did not deny having talked with Paul Oller, but could not say one way or the other. Even in her condition, Mary Storm expressed her opposition to the proposed sale. She also expressed dislike for the Security State Bank officer she believed was responsible for the sale effort.]

"**26**. On October 16, 1989, hearing was had before the magistrate judge on Ralph Pfenninger's Petition for Involuntary Conservatorship and Mary Storm's Motion for Disqualification of Brantley. Apparently based upon his interview with Mary Storm, the magistrate judge ordered her attorney, Paul Oller, discharged from her representation and the motions filed by Oller were denied. No decision was reached in connection with the Petition for Involuntary Conservatorship, which matter was continued to November 14, 1989.

"**27**. On October 25, 1989, Mary Storm's attorney, Paul R. Oller, filed an Attorney and Client Agreement with the court followed with the filing of a renewed answer on behalf of Mary Storm raising issues earlier asserted. Mary Storm again requested that Respondent Brantley be disqualified because of a conflict of interest, but the Respondent continued his representation of the step-son in the adversarial involuntary conservatorship proceeding.

"**28**. At a court hearing on November 6, 1989, Respondent Brantley; Louise Wendler from the Security State Bank; Mary Storm's attorney, Paul Oller; and court appointed attorney, Bill Wright, appeared and agreed to a partial conservatorship of Mary Storm's assets which would not include her home, any of her personal property and her personal bank account for her own spending. Security State Bank was discharged and a new conservator appointed. No conservatorship bills were presented at the November 6, 1989, hearing when all of the parties were represented. Instead, Respondent Brantley, representing the discharged conservator, prepared an order for the magistrate's approval for the discharged conservator to pay claims of $1,802.41 including $575.00 to Respondent Brantley. Respondent Brantley gave no notice of such order for proceedings thereon. His bill for services was never furnished to Mary Storm or her attorney, Paul Oller. As a result of the order for approval of claims of the conservator, Mary Storm paid for Respondent Brantley's representation of the Security State Bank and the step-son, Ralph Pfenninger, which services included efforts to sell her personal property and place her in an involuntary conservatorship, both against her expressed wishes.

"**29**. In November 1989, Mary Storm was returned to possession of her home where she continued to reside with minimal outside assistance until the Spring of 1993, at which time she moved to Anchorage, Alaska, to live with her son, Wayne Hendrix, and his wife.

"**30**. In July 1993, Mary Storm executed affidavits and powers of attorney empowering her granddaughter, Carla Hendrix, to return to Kansas, gather her assets, terminate the conservatorship and transfer Mary's assets to Alaska. As an alternative the conservatorship could be transferred to Alaska for court supervision.

"**31**. A hearing was had on Mary Storm's request at which hearing Respondent Brantley appeared on behalf of the step-son in opposition to Mary Storm's expressed wishes. Mary Storm's request was denied by the court for the stated reason that she was not represented at the hearing and needed to be represented in order for a full adjudication to be rendered. Later, however, on October 13, 1993, the Mary Storm conservatorship was transferred to Anchorage, Alaska, to be supervised by the probate court in that jurisdiction. Since such transfer both the step-son, Ralph Pfenninger, and the Respondent Brantley have continued to attempt to monitor said proceedings and to obtain confidential information from the Alaska conservatorship.

"**32**. In ex parte meetings with the magistrate judge and in scheduled hearings in the Storm case, Respondent justified the need for a conservatorship for Mary Storm by stating that the evidence would prove that her son, Wayne Hendrix, was an alcoholic, was financially irresponsible, and was guilty of wrongfully misappropriating some $85,000.00 of her funds. In fact, Respondent did not have evidence to support such claims and had not made a reasonable investigation in such regard.

[Brantley responded as follows:

*"There is no evidence in the record Respondent had any ex parte meetings with the magistrate judge or that Respondent stated to the court Wayne Hendrix was an alcoholic or was financially irresponsible. Respondent stated in open court on two occasions the evidence would be that Wayne Hendrix had misappropriated approximately $85,000.00 of Mary Storm's funds. The uncontroverted*

*evidence, not only reasonably believed by Respondent to be what*
*he would offer in support of this statement, but was in fact what*
*Respondent did offer in support of this statement to the hearing*
*panel was as follows: Respondent called Louise Wendler at Security*
*State Bank. She told Respondent about the transfers of funds from*
*Mary to Wayne's account and that she believed these were mis-*
*appropriations by Wayne Hendrix in the approximate amount of*
*$85,000.00."]*

[We observe that Carla Hendrix testified she learned Brantley claimed the voluntary conservatorship was needed because her father, Wayne, was stealing Mary Storm's money, and Wayne was an alcoholic and in bankruptcy. Ralph Pfenninger admitted telling Brantley such information. However, there was no direct testimony that Brantley stated to Judge Goering that Wayne was an alcoholic and financially irresponsible. Whether Brantley did or did not state to Judge Goering that Wayne was an alcoholic and financially irresponsible is not material to the panel's ultimate finding of an ethical violation. The record revealed two occasions when Brantley represented to Judge Goering he had evidence that Wayne had misappropriated $85,000 of Mary Storm's funds: September 29, 1989 (the date the ex parte temporary restraining order was issued) and the July 1993 hearing when Carla Hendrix requested funds from the conservator to move Mary Storm's belongings to Alaska.]

[The witnesses were in dispute as to whether Paul Oller and Carla Hendrix were present at the time Brantley made the statement on September 29, 1989, to Judge Goering. Paul Oller and Carla Hendrix believed those conversations took place after they left the courthouse that morning with the judge's signature on the order terminating the conservatorship. They were surprised to later learn that the judge had issued an ex parte temporary restraining order. Brantley, Wright, and Judge Goering stated that Oller and Carla Hendrix were present for those discussions, although Wright and Judge Goering were vague in their recollections. The panel believed the testimony of Oller and Carla Hendrix.]

"**33.** While never medically or judicially determined, Mary Storm's ability to make adequate considered decisions in connection with Respondent's representation was, from time to time, ap-

parently impaired, particularly during her nursing home stay and her post-cancer surgery period.

## CONCLUSIONS

"**1**. A majority of the Hearing Panel conclude that the following noted violations of the Model Rules of Professional Conduct, Supreme Court Rule 226 [1995 Kan. Ct. R. Annot. 245], were established by clear and convincing evidence.

"**2**. MRPC 1.1 Competence [1995 Kan. Ct. R. Annot. 251]—Respondent failed to provide competent representation to his clients in the following particulars: (a) failure to fully investigate the claims of improper transfers from the account of Mary Storm and the threatened dissipation of her assets prior to initiating conservatorship proceedings; (b) failure to personally interview a client for whom a conservatorship proceeding was proposed; (c) permitting his client conservator to proceed with sale related activities in regard to Mary Storm's personal property before a court order had been entered directing such sale, which activity resulted in unwarranted expense to Mary Storm; (d) obtaining an ex parte order in a closed involuntary conservatorship proceeding, all in connection with a planned involuntary conservatorship proceeding not yet filed; (e) preparing and causing to be filed a Petition for Involuntary Conservatorship relying on a non-existent medical report, which is herein characterized as incompetence only because there is insufficient evidence to establish a violation of MRPC 3.3 Candor Toward the Tribunal [1995 Kan. Ct. R. Annot. 311].

"**3**. MRPC 1.2 Scope of Representation [1995 Kan. Ct. R. Annot. 255]—Respondent failed to abide by his client Mary Storm's decisions concerning the representation.

"**4**. MRPC 1.4—Communication [1995 Kan. Ct. R. Annot. 263]—Respondent failed to keep his client, Mary Storm, reasonably informed.

"**5**. MRPC 1.5 Fees [1995 Kan. Ct. R. Annot. 268]—Respondent failed to communicate the basis or rate of the fee to the client, Mary Storm, who was ultimately responsible therefore, and caused her estate to be charged for legal services rendered to adversarial persons.

"**6.** MRPC 1.7 Conflict of Interest [1995 Kan. Ct. R. Annot. 275]—Respondent represented Security State Bank and Ralph Pfenninger in matters adverse to his client, Mary Storm, without consulting and without consent.

"**7.** MRPC 1.9 Conflict of Interest [1995 Kan. Ct. R. Annot. 281]—Respondent, after undertaking to represent Mary Storm, later represented others in substantially related matters in which interests were materially adverse to her, all without her consent after consultation.

"**8.** MRPC 1.14 Client Under Disability [1995 Kan. Ct. R. Annot. 293]—Respondent failed to reasonably maintain a normal client-lawyer relationship with Mary Storm when he believed her to be under a disability.

"**9.** MRPC 3.3 Candor Toward the Tribunal [1995 Kan. Ct. R. Annot. 311]—Respondent made statements and allegations to the magistrate court which he knew, or should have known, to be false. In addition, he made false statements to the magistrate court without making reasonable and diligent inquiry, as above noted, into the true facts.

"**10.** MRPC 8.4 Misconduct [1995 Kan. Ct. R. Annot. 340]—As a result of the foregoing conclusions, Respondent has violated the rules of professional conduct and has engaged in conduct prejudicial to the administration of justice."

The Disciplinary Administrator recommended to the panel a sanction for a definite period of time, such as 6 months, conditioned upon restitution and taking and passing the Multistate Professional Responsibility Examination.

In a split decision, the panel recommended published censure with costs assessed to Brantley. One panel member dissented, agreeing with Brantley's position.

## DISCUSSION

A threshold observation in beginning our analysis relates to our standard of review.

Rule 212(f) (1995 Kan. Ct. R. Annot. 215) provides:

"The recommendations of the panel or the Disciplinary Administrator as to sanctions to be imposed shall be advisory only and

shall not prevent the Court from imposing sanctions greater or lesser than those recommended by the Panel or the Disciplinary Administrator."

"In *State v. Klassen*, 207 Kan. 414, 415, 485 P.2d 1295 (1971), we explained that we have a 'duty in a disciplinary proceeding to examine the evidence and determine for ourselves the judgment to be entered.' In *State v. Ziegler*, 217 Kan. 748, 755, 538 P.2d 643 (1975), this court stated that, although the report of the disciplinary board 'is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony.' [Citation omitted.]" *In re Carson*, 252 Kan. 399, 406, 845 P.2d 47 (1993).

We now turn to the panel's findings of Brantley's rule violations.

## MRPC 1.1—Competence

MRPC 1.1 (1995 Kan. Ct. R. Annot. 251) provides:

"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

The Comment provides in part:

"In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. . . .

. . . .

"Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation." 1995 Kan. Ct. R. Annot. 251-52.

Brantley has been practicing law in Scott City since 1970. He was the attorney for the executor of the estate of Scott McCormick, Mary Storm's brother, with Mary Storm being the sole heir of that estate. Brantley prepared a codicil for Mary Storm's will (naming him as her executor) and in 1986, at her request, prepared assignments by which Mary Storm created joint tenancy ownership in three real estate installment contracts with her son, Wayne. Brantley was an experienced attorney well acquainted with Mary Storm and her legal affairs.

(a) Failure to Fully Investigate Claims of Improper Transfers

According to Brantley, the driving force behind this whole unfortunate scenario was Brantley's belief that Wayne Hendrix had misappropriated $85,000 from Mary Storm. After Ralph Pfenninger and Louise Wendler told him of the supposedly suspicious transfers by Wayne Hendrix in 1986 and 1987, Brantley called Mary Storm at the nursing home in July 1989 and asked her if she knew about them. Brantley did not provide sufficient information to Mary Storm for her to respond to his inquiry. She could not have made an informed decision about transactions that occurred some two years earlier, based on the scant information Brantley provided her over the telephone. There is no indication that Brantley ever asked Mary Storm if she wanted him to investigate the bank records on this matter, or that Brantley (with Mary Storm's permission) ever obtained or showed the documentation or specific information on these transfers to Mary Storm to confirm whether she knew or approved of them.

The subject wire transfers were from the Hendrix account at Security State Bank in Scott City to the Hendrix account in Alaska and all occurred from October 1986 (prior to Mary's broken hip) to January 1988. Those transfers, by themselves, should not have aroused suspicion. There were several large deposits into the Hendrix account at Security State Bank from April 1986 to July 1987, totalling $191,425.62. All but $69,862.88 of those deposits took place prior to December 1986, before Mary Storm broke her hip.

The panel's finding of incompetence based on Brantley's failure to investigate the circumstances of the supposedly improper transfers is amply supported in the record.

### (b) Failure to Interview Mary Storm Before Proposing the Conservatorship

Establishment of a conservatorship, even a voluntary one, is a drastic step. See *In re Conservatorship of Marcotte*, 243 Kan. 190, Syl. ¶ 1, 756 P.2d 1091 (1988) ("A voluntary conservatee may not dispose of personal property by *inter vivos* conveyance during the conservatorship without court approval."). Yet Brantley took this drastic step without even a face-to-face interview with Mary Storm, choosing instead to rely on a brief telephone conversation and the statements of Ralph Pfenninger, her stepson, and Louise Wendler from Security State Bank.

### (c) Permitting Sale-related Activities Prior to Court Approval

As Brantley emphasized, there is no evidence in the record that Brantley knew Security State Bank engaged an auction company and incurred advertising expenses before the sale was approved by the court. The bank's actions were improper, but there was no evidence that Brantley permitted those actions.

The panel's conclusion that Brantley permitted the Bank's actions does not appear to be supported by the evidence in the record. Other conduct by Brantley, however, established his violations of MRPC 1.1.

### (d) Obtaining Ex Parte Order Prior to Filing Petition for Involuntary Conservatorship

The record indicates that after Judge Goering terminated the voluntary conservatorship, Brantley represented to the judge that he had evidence Wayne Hendrix had misappropriated $85,000 of Mary Storm's funds and that Mary Storm's assets were at risk without a conservatorship in place. Not surprisingly, Judge Goering then suggested that an involuntary conservatorship should be filed, issued the temporary restraining order against Mary Storm's assets, and directed William Wright, as guardian ad litem, to lock up her house. Judge Goering acted upon Brantley's inaccurate, incomplete, and unsupported representations. Brantley demonstrated incompetence by making those representations to the judge.

### (e) Filing Involuntary Petition Containing Allegation as to Non-existent Medical Report

Brantley excuses this mishap because the allegation was taken from a standardized form and left in the petition by mistake. Also, Judge Goering had already stated he would not rely on a doctor's letter and intended a complete evaluation of Mary Storm by Area Mental Health Center.

The fact that Judge Goering would not rely on a doctor's letter does not excuse Brantley's incompetence in leaving this untrue allegation in the petition. If Brantley knew at the time the petition was drafted that Judge Goering was not going to rely on a doctor's letter, then why was the allegation included? Even if this allegation was taken from a standardized form, it specifically referred to both Mary Storm and Dr. Dunn. The involuntary petition was a two-page document easy to proofread.

### MRPC 1.2—Scope of Representation

MRPC 1.2 (1995 Kan. Ct. R. Annot. 255) provides:

"(a) A lawyer shall abide by a client's decisions concerning the lawful objectives of representation, subject to paragraphs (c), (d), and (e), and shall consult with the client as to the means which the lawyer shall choose to pursue."

The Comment provides in part:

"The client has ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. . . .

"In a case in which the client appears to be suffering mental disability, the lawyer's duty to abide by the client's decisions is to be guided by reference to Rule 1.14. " 1995 Kan. Ct. R. Annot. 255-56.

### Failure to Abide by Mary Storm's Decisions Concerning Representation

Brantley never consulted with Mary Storm as to whether she wanted to have her household property auctioned off. Instead, he relied on Louise Wendler's and the guardian ad litem's statements that Mary Storm had agreed to the sale. At the September 29, 1989,

court appearance, when he learned that Paul Oller had filed an objection to the sale on behalf of Mary Storm and the conservatorship had been terminated, Brantley represented to Judge Goering that Hendrix was misappropriating Mary Storm's funds and convinced the judge that a temporary restraining order needed to be issued. Brantley followed that representation by filing the petition for involuntary conservatorship signed by Ralph Pfenninger. Brantley's authority to act on behalf of Mary Storm ended when the voluntary conservatorship was terminated.

Brantley contends that the parties' settlement agreement in November 1989 allowing the conservatorship to continue somehow cures this ethical violation. Brantley ignores the fact that before the settlement agreement was reached, Mary Storm had to retain her own attorney to represent her interests and oppose the involuntary conservatorship.

### MRPC 1.4—Communication

MRPC 1.4 (1995 Kan. Ct. R. Annot. 263) states:

"(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

The Comment provides in part:

"The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. . . .

". . . The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interests, and the client's overall requirements as to the character of representation.

"Ordinarily, the information to be provided is that appropriate for a client who is a comprehending and responsible adult. However, fully informing the client according to this standard may be impracticable, for example, where the client is a child or suffers

from mental disability. See Rule 1.14." 1995 Kan. Ct. R. Annot. 263.

Mary Storm has not been determined to be mentally incompetent or disabled, so she should have been entitled to appropriate communication from Brantley. Brantley breached his ethical obligation to Mary Storm when, prior to the conservatorship, he failed to provide her sufficient information (and get her permission to do so) to make an informed decision concerning the purported suspicious fund transfers by Wayne Hendrix. Thereafter, he failed to communicate at all with Mary Storm, though he claims to have done so through the conservator and the guardian ad litem.

Mary Storm obviously was not given sufficient information about the proposed sale of her household property to make an informed decision. She voiced to Judge Goering during his ex parte hospital visit her opposition to the sale.

### MRPC 1.5—Failure to Communicate Fees and Charging for Services Rendered to Adversaries

MRPC 1.5 (1995 Kan. Ct. R. Annot. 268-69) provides in part:

"(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

. . . .

"(4) the amount involved and the results obtained."

Brantley never sent any fee statements to Mary Storm in connection with the conservatorship. He sent those to the conservator for payment. Mary Storm should have been advised of Brantley's fees. Brantley claims that he did not render any services to adversarial persons in connection with the conservatorship because neither Security State Bank nor Ralph Pfenninger "had any other thought than to help Mary Storm." However, fees generated by Brantley in pursuing the proposed sale, temporary restraining order, and the involuntary petition were adversarial to Mary Storm. Those fees were paid by the conservator.

### MRPC 1.7—Conflict of Interest

MRPC 1.7 (1995 Kan. Ct. R. Annot. 275) provides in part:

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

"(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

"(2) each client consents after consultation."

The Comment provides in part:

"Loyalty is an essential element in the lawyer's relationship to a client. An impermissible conflict of interest may exist before representation is undertaken, in which event the representation should be declined. If such a conflict arises after representation has been undertaken, the lawyer should withdraw from the representation." 1995 Kan. Ct. R. Annot. 275.

Brantley faced a conflict of interest from the beginning. Ralph Pfenninger saw Brantley in July 1989 and wanted a conservatorship for Mary Storm after Louise Wendler told Ralph that she had suspicions that Wayne Hendrix was misappropriating Mary's funds. Ralph was named as a residuary legatee under the mutual will of Mary and Ralph's father, R.E. Pfenninger. R.E. Pfenninger died in 1977. The residuary clause of this mutual will, obligated Mary, as survivor, to devise her residue in equal shares to her natural child, Wayne, and her husband R.E. Pfenninger's four natural children (or their issue, if not then living). Ralph may have believed that he would be entitled to a share of Mary's estate upon her death under this residuary clause. If so, Ralph had an obvious incentive to keep Mary Storm's assets intact until her death and restrict her ability to make inter vivos gifts. Brantley had assisted Mary Storm in placing her interests in three real estate installment contracts in joint tenancy with Wayne. Brantley handled Mary's brother's estate (Scott McCormick), which made a substantial distribution to Mary in 1986. It would be no surprise if Ralph Pfenninger harbored some jealousy and resentment toward Mary's son Wayne and would be anxious to stop Mary from giving her property to Wayne. During oral argument, Brantley stated he was unaware that Ralph Pfenninger was a residuary legatee under Mary's will, but indicated he would not have acted any differently if he had known that fact.

After Mary Storm retained Paul Oller to file an objection to the proposed sale of her household goods and obtain termination of

the voluntary conservatorship, Brantley should have withdrawn from the case. Even if Brantley was unaware of Ralph's status as a residuary legatee under Mary's will, the adversarial relationship was clear by that point. He never obtained Mary Storm's consent to represent Security State Bank, Ralph Pfenninger, or both in seeking an involuntary conservatorship.

Brantley demonstrated mixed loyalties by failing to adequately investigate and relying on unsubstantiated suspicions of Ralph Pfenninger and Louise Wendler that Wayne Hendrix was misappropriating Mary Storm's funds. Brantley's pursuit of the involuntary conservatorship after Mary Storm retained her own attorney to oppose the sale and conservatorship confirmed this, as did his representation of Ralph Pfenninger in opposing Carla Hendrix's request for funds from the conservatorship to pay for moving expenses of Mary Storm's belongings to Alaska in 1993.

Brantley argues that his representation of Security State Bank or Ralph Pfenninger in the conservatorship matter was never adverse to Mary Storm because she ultimately needed a conservatorship. He contends that the fact she retained Paul Oller to oppose the conservatorship should be disregarded, because Judge Goering struck Oller's pleadings after interviewing Mary Storm ex parte at the hospital. Aside from Judge Goering's own conduct, his interview with Mary Storm made one thing very plain: Mary opposed the efforts to sell her household property.

Brantley cites two cases from other jurisdictions, *Hillman v. Stults*, 263 Cal. App. 2d 848, 70 Cal. Rptr. 295 (1968), and *American Nat. Bank v. Bradford*, 28 Tenn. App. 239, 188 S.W.2d 971 (1945), to support his argument that his simultaneous representation of Mary Storm, Security State Bank, and Ralph Pfenninger was not adverse to Mary Storm.

Both cases are distinguishable. *Bradford* involved a ward initially adjudged insane. Mary Storm has never been adjudged incompetent or disabled in any sense. In *Hillman*, the court determined the attorneys' and conservators' prior isolated representation of the conservatee's sister did not present any conflicts or involve confidential information, so disqualification for conflict of interest was not appropriate in a proceeding adversarial to the then-deceased

sister. 263 Cal. App. 2d at 879-80. Brantley obtained confidential information concerning Mary Storm's and her son's banking transactions and used that information to advance the interests of Mary Storm's stepson, who wanted an involuntary conservatorship for Mary so that her assets could be preserved.

## MRPC 1.9—Conflict of Interest: Former Client

MRPC 1.9 (1995 Kan. Ct. R. Annot. 281) states in part:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

"(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

"(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

The Comment states in part:
"When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. . . .

"Information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client." 1995 Kan. Ct. R. Annot. 282.

Brantley's representation became "materially adverse" to Mary Storm when she retained Paul Oller to stop the proposed sale and terminate the voluntary conservatorship. Thereafter, Brantley sought the temporary restraining order and involuntary conservatorship on behalf of Ralph Pfenninger and Security State Bank. The involuntary conservatorship petition satisfies the elements of a MRPC 1.9(a) violation. Mary Storm, the former client, did not consent to, nor was she consulted about, Brantley's continued involvement in the case after she retained Paul Oller.

Brantley's representation of Pfenninger in opposition to Carla Hendrix's request in 1993 for funds to move Mary Storm's personal property to Alaska was "materially adverse" to Mary Storm. Again,

Brantley did not request or receive consent from Mary Storm for this adverse representation.

## MRPC 1.14—Client Under Disability

MRPC 1.14 (1995 Kan. Ct. R. Annot. 293) states:

"(a) When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.

"(b) A lawyer may seek the appointment of a guardian or take other protective action with respect to a client, only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest."

The Comment provides in part:

"The normal client-lawyer relationship is based on the assumption that the client, when properly advised and assisted, is capable of making decisions about important matters. When the client . . . suffers from a mental disorder or disability, however, maintaining the ordinary client-lawyer relationship may not be possible in all respects. In particular, an incapacitated person may have no power to make legally binding decisions. Nevertheless, a client lacking legal competence often has the ability to understand, deliberate upon, and reach conclusions about matters affecting the client's own well-being. Furthermore, to an increasing extent the law recognizes intermediate degrees of competence. . . . [I]t is recognized that some persons of advanced age can be quite capable of handling routine financial matters while needing special legal protection concerning major transactions.

"The fact that a client suffers a disability does not diminish the lawyer's obligation to treat the client with attention and respect. If the person has no guardian or legal representative, the lawyer often must act as de facto guardian. Even if the person does have a legal representative, the lawyer should as far as possible accord the represented person the status of client, particularly in maintaining communication.

"If a legal representative has already been appointed for the client, the lawyer should ordinarily look to the representative for decisions on behalf of the client." 1995 Kan. Ct. R. Annot. 293.

The record indicates that Brantley totally disregarded this rule. He had one telephone call with Mary Storm before filing the voluntary conservatorship and failed to provide her with adequate information in that call. Thereafter, he had no direct communication with Mary Storm.

### MRPC 3.3—Candor Toward the Tribunal

MRPC 3.3 (1995 Kan. Ct. R. Annot. 311-12) states:

"(a) A lawyer shall not knowingly:

"(1) make a false statement of material fact or law to a tribunal. . . .

. . . .

"(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse."

The Comment provides in part:

"An advocate is responsible for pleadings and other documents prepared for litigation, but is usually not required to have personal knowledge of matters asserted therein, for litigation documents ordinarily present assertions by the client, or by someone on the client's behalf, and not assertions by the lawyer. . . . However, an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." 1995 Kan. Ct. R. Annot. 312.

The Comment indicates that a lawyer making an assertion in open court without a belief that the assertion is true, based on reasonably diligent inquiry, may violate the rule.

As described in the panel's Findings of Fact Nos. 16 and 23, Brantley made untrue allegations in pleadings filed in the court. Also, in obtaining the ex parte temporary restraining order, Brantley represented to Judge Goering after termination of the volun-

tary conservatorship that Wayne Hendrix had misappropriated $85,000 of Mary Storm's funds and her assets were at risk. Brantley continued to make this representation to the court at the 1993 hearing when Carla Hendrix sought funds from the conservator to pay for moving Mary Storm's belongings to Alaska, where Mary Storm lived.

Brantley contends that he made no knowingly false statements to the court and his representation that Hendrix had misappropriated $85,000 of Mary Storm's funds had a reasonable basis.

There does not appear to be any evidence in the record that Brantley made knowingly false statements to the court. However, according to the Comment, Brantley's failure to make a reasonable investigation regarding the Hendrix fund transfers before accusing Hendrix in court of misappropriating funds may be considered a violation of the rule. Making such accusations in an ex parte setting violates MRPC 3.3(d). The record does not show that Brantley provided the judge complete information about these transfers, such as the dates of the transfers (the last one well over a year before the conservatorship) and the fact that they involved only Hendrix's own account.

## MRPC 8.4—Misconduct

MRPC 8.4 (1995 Kan. Ct. R. Annot. 340) states in part:
"It is professional misconduct for a lawyer to:
"(a) Violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another."

Brantley has violated numerous rules of ethical conduct.

## Aggravating and Mitigating Factors

The panel found the following aggravating and mitigating factors in the report:

"Aggravating factors:
1. A pattern of misconduct is established throughout the Mary Storm conservatorship matter involving multiple offenses.

2. Respondent steadfastly refuses to acknowledge the wrongful nature of his conduct, and expresses remorse only if found to be in violation of the Model Rules of Professional Conduct.

3. The victim in this matter, Mary Storm, was quite vulnerable to the abuses and violations noted herein.

4. The Respondent has substantial experience in the practice of law.

"Mitigating factors:

1. The Respondent has no prior disciplinary offenses.

2. While Respondent's actions are subject to the perception that he could financially benefit from a conservation of Mary Storm's assets in Scott City, should he someday handle the probate of her estate, the panel does not find any dishonest or selfish motive."

Brantley takes exception to aggravating factor No. 1 and mitigating factor No. 2. All factors were amply supported by the record.

### Restitution

The Disciplinary Administrator requests that this court reconsider the issue of restitution. At the hearing, the Disciplinary Administrator submitted exhibits of fees and expenses, and Carla Hendrix testified as to the expenses and legal fees incurred in connection with the conservatorship, both in Scott City and Alaska. These included, among other things, Brantley's fees charged to the conservatorship totalling $1,180 in 1989. She also listed certain travel expenses she had incurred in making trips between Alaska and Scott City in connection with the conservatorship proceedings, additional attorneys' fees incurred in Alaska, and other miscellaneous expenses totalling approximately $11,000 all attributed to the dispute over the conservatorship.

The panel did not recommend restitution. We order restitution to include Brantley's fees in the sum of $1,180.

### Conclusion

The panel recommended that Respondent be publicly censured under Supreme Court Rule 203(a)(3) (1995 Kan. Ct. R. Annot. 191) and that costs be assessed against Respondent. We find in the record clear and convincing evidence sustaining the panel's con-

clusions that Brantley violated MRPC 1.1, 1.2, 1.4, 1.5, 1.7, 1.9, 1.14, 3.3, and 8.4 and that he be sanctioned by published censure. We accept the report of the panel. We concur in the findings, conclusions, and recommendations of the panel with the additional imposition of restitution of attorney fees received by Brantley. Restitution is ordered in the sum of $1,180.

IT IS ORDERED THAT Keen K. Brantley be subject to published censure for his violations of the Model Rules of Professional Conduct.

IT IS FURTHER ORDERED THAT this order be published in the official Kansas Reports and that the costs of the proceeding, including the sum of $1,180 as restitution, be assessed against respondent, to be paid to the office of the Disciplinary Administrator within 60 days from the date of this opinion.